MANUEL GONZALEZ, Respondent, v STATE OF NEW YORK, Appellant.

The present claim was instituted by service of a summons and amended verified complaint on or about February 19, 1982, wherein claimant alleged as against defendant State of New York that his involuntary confinement at the State-owned and operated Kingsboro Hospital Psychiatric Center (Kingsboro) from March 14, 1981 until March 16, 1981 constituted false imprisonment for which he could recover monetary damages.

At the trial, Police Officer Mitchell Friar testified that he began his tour of duty as a transit officer at 7:30 P.M. on March 13, 1981. At 4:08 A.M. on March 14, 1981, after disembarking from an "A" train, Officer Friar discovered claimant lying across the subway tracks at the Hoyt-Schermerhorn station in Brooklyn. When he initially spotted claimant, claimant was positioned on the running rail of the tracks, lying on his right side with both hands resting underneath his head. His eyes were

shut. As Officer Friar shouted to claimant to get up, he opened his eyes and grinned. When Officer Friar began questioning claimant, he discovered that claimant could neither identify himself nor explain his presence on the subway tracks. Subsequently, two other police officers assisted Friar in removing claimant from the tracks. Claimant resisted the officers' attempts to escort him to the precinct, thus requiring that he be placed in handcuffs. Claimant did not appear to be intoxicated.

Shortly after arriving at the police station, Officer Friar was instructed by his supervisory sergeant to bring claimant to Kings County Hospital for psychiatric evaluation. At approximately 6:15 A.M., claimant was admitted to said hospital. Thereafter, claimant was transferred to Kingsboro by ambulance. Dr. Guarin, a staff psychiatrist at Kingsboro, with the aid of a Spanish interpreter, prepared a handwritten admission note after interviewing claimant. Dr. Guarin indicated that claimant denied any intent to commit suicide or to having auditory hallucinations, although he admitted to such hallucinations while at Kings County Hospital. Dr. Guarin further noted that claimant said he had had six glasses of beer with friends the night before but denied having an alcohol problem. Additionally, claimant appeared to be clean-shaven, cleanly clothed and appropriate in his behavior except for apparent sleepiness. Dr. Guarin did not find claimant to be delusional or suicidal at the time of this initial interview.

In a "Problem List", also prepared by Dr. Guarin, claimant was described as having a psychosis manifested, *inter alia,* by "impaired insight & judgment". In another hospital report, Dr. Guarin noted that "[claimant] goes to excessive drinking and when intoxicated can injure himself or maybe [others]".

Claimant remained at Kingsboro for psychiatric evaluation until March 16, 1981, when it was determined by various staff members, including a social worker, supervisors and the hospital director, that claimant should be released.

Claimant's version of what happened at the time of his detention differed markedly from that of Officer Friar. According to claimant, he had left school at 10:30 P.M. on March 13, 1981 and went directly to the subway station at Hoyt and Schermerhorn Streets to take the "GG" train home. Claimant stated that while he was waiting for his train to arrive, he was struck underneath his left arm by an unknown assailant, which caused him to fall onto the tracks. He stated that a police officer came to his assistance and brought him to the station house, where he remained until about 3:00 A.M.

At 3:00 A.M., claimant was brought to Kings County Hospital from which he was discharged at 6:30 A.M. and then was taken by ambulance to Kingsboro. Claimant stated that he had informed hospital personnel of his desire to go home. Claimant was asked whether he had family members who could be contacted, to which he responded affirmatively. Sometime between 10:30 and 11:00 A.M., claimant's sister, brother and sister-in-law arrived at the hospital. They stayed until 2:00 P.M. when visiting hours were over. Thereafter, claimant was placed in a room on the psychiatric floor with approximately 25 other patients. He remained on the wards during the day and night of March 15, 1981. A female supervisor came by about once every hour to check claimant, during which time she made entries in a notebook. Claimant was again visited by his relatives.

At 10:30 A.M. on March 16, 1981, claimant was informed that his release had been authorized.

The trial court found, *inter alia,* that claimant's confinement was not privileged under Mental Hygiene Law § 9.39 because the evidence failed to demonstrate that claimant posed a substantial risk of physical harm to himself or others.

In order to recover on a cause of action for false imprisonment, four elements must be proved by the plaintiff: (1) the defendant's intent to confine, (2) the plaintiff's consciousness of the confinement, (3) that the confinement was involuntary and (4) that the confinement was not privileged (*Broughton v State of New York,* 37 NY2d 451, 456, *cert denied sub. nom. Schanbarger v Kellogg,* 423 US 929; *Parvi v City of Kingston,* 41 NY2d 553, 556). In the case at bar, the only disputed issue is whether the fourth element (i.e., privilege) was sufficiently established.

While cognizant that the burden of proving privilege is upon the person or entity charged with the commission of the tort (*Hollender v Trump Vil. Coop.,* 58 NY2d 420, 425), we find, after reviewing all the evidence in the record, that there was a sufficient basis upon which defendant could invoke the privilege provided by Mental Hygiene Law § 9.39. Subdivision (a) of that section permits an institution to retain patients for a period of 15 days who are alleged to have "a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others". The term "[l]ikelihood to result in serious harm" is defined, in relevant part, as a "substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself" (Mental Hygiene Law § 9.39 [a] [1]). Although some of the evidence suggests that claimant was

not suicidal or delusional at the time of his admission to Kingsboro, there are several statements in claimant's hospital records to show that he had exhibited signs of psychosis as manifested by impaired insight and judgment, vague auditory hallucinations and vague suicidal thoughts.

Furthermore, we do not agree with the trial court that the events leading up to claimant's detention are irrelevant with respect to a determination of privilege. The unusual circumstances under which claimant was found, together with his inappropriate grin when awakened by Officer Friar, demonstrate a sufficient basis upon which to believe claimant was suicidal or mentally disturbed. Moreover, Dr. Guarin was aware of these circumstances when he first interviewed claimant, although he also listened to and noted claimant's explanation that an unknown assailant pushed him onto the subway tracks. Furthermore, despite frequent visits from several of claimant's family members during his stay at Kingsboro, there is nothing to indicate that they shared claimant's belief that he should be released from the hospital without psychiatric evaluation.

Nor do we find that claimant was detained merely because the Chief Medical Officer of the Acute Admissions Unit could not be contacted for consultation or because a hospital administrator advised that claimant be kept in the hospital until Monday, March 16, 1981, despite such notations in Dr. Guarin's report. Nothing in the record suggests that these factors were directly responsible for Dr. Guarin's decision to admit claimant for psychiatric evaluation. It is clear that there were sufficient independent factors which justified the hospital staff's decision. The evidence adduced at trial provided enough of a basis to find privilege in accordance with the statutory requirements of the Mental Hygiene Law. Therefore, claimant has failed to prove a prima facie case of false imprisonment. Titone, J. P., Gibbons and O'Connor, JJ., concur.

Mangano, J., dissents, and votes to affirm the judgment appealed from, with the following memorandum: In upholding the claimant's action for false imprisonment against the State of New York, the Court of Claims specifically held that the State had not met its burden of establishing that claimant's continued confinement in Kingsboro from March 14, 1981 to March 16, 1981 was privileged, i.e., that he had a mental illness which was "likely to result in serious harm to himself or others" (Mental Hygiene Law § 9.39; *Broughton v State of New York,* 37 NY2d 451, *cert denied sub nom. Schanbarger v Kellogg,* 423 US 929; *Hollender v Trump Vil. Coop.,* 58 NY2d 420, 425).

In my view, there was ample evidence in the record to support the holding of the Court of Claims. Although claimant was first

discovered by the police lying on the subway tracks, claimant testified that he fell onto the tracks as a result of a blow inflicted upon him underneath his left arm by an unidentified assailant; indeed, his testimony in this regard was corroborated by his display of " 'some superficial reddened skin injury' " (*Gonzalez v State of New York,* 121 Misc 2d 210, 211).

Of even greater significance were the findings of the admitting psychiatrist at Kingsboro on the morning of March 14, 1981. The report prepared by the psychiatrist on claimant's admission indicated, *inter alia,* that (1) claimant "appeared * * * quite appropriate in his behavior", (2) there was "*no* evidence of a thinking disorder", (3) claimant "did *not* show any delusioned ideas", and (4) "[t]here was no evidence of suicidal or homocidal [*sic*] ideation at this Interview" (*Gonzalez v State of New York, supra,* pp 211-213). Moreover, the admission report strongly suggested that the claimant was not being released immediately because the physician authorized to release him could not be contacted. The remaining reports prepared by the psychiatrist at best suggested that claimant was only an alcoholic and was not mentally ill as required to invoke the privilege under Mental Hygiene Law § 9.39.

Since the determination of the Court of Claims was not incorrect or against the weight of the evidence, it should not be disturbed on appeal (*Zalewski v State of New York,* 53 AD2d 781; *Harrow v State of New York,* 21 AD2d 571, *affd* 17 NY2d 619).

Accordingly, I dissent and vote to affirm the judgment of the Court of Claims.