**Jane RUBENSTEIN, and Mary Ann Bagatta, Individually, and on Behalf of all Others Similarly Situated, and Disability Advocates, Inc., as the Protection and Advocacy Agency for Mentally Ill Individuals in the Hudson Valley Region of New York State, Plaintiffs,**

v.

**BENEDICTINE HOSPITAL, Dr. George Joseph, Dr. K. Gulati, and Unidentified Staff Physician, Defendants.**

No. 92–CV–1046.

United States District Court, N.D. New York.

April 7, 1992.

Disabilities Advocates, Inc., Albany, N.Y. (Cailie Currin and Timothy A. Clune, of counsel), for plaintiffs.

Thuillez, Ford Law Firm, Albany, N.Y. (Michael J. Hutter, Jr., of counsel), for defendant, Benedictine Hosp.

Martin, Clearwater Law Firm, New York City (Anthony M. Sola, of counsel), for defendant, Dr. George Joseph.

Nixon, Hargrave, Devans & Doyle, Albany, N.Y. (Andrew C. Rose, of counsel), for defendant, Dr. Kulbhushan Gulati.

## MEMORANDUM DECISION AND ORDER

CHOLAKIS, District Judge.

This action involves the involuntary commitment of the two individual plaintiffs and, ostensibly, of the members of the would-be class of plaintiffs. Plaintiffs Rubenstein and Bagatta are individuals who, by different means, arrived, on different dates, at the emergency room of defendant Benedictine Hospital, a private "hospital" as that term is defined in Article 28 of the New York Public Health Law, and a "facility" as that term is defined in the New York Mental Hygiene Law.

Defendant Gulati is a physician who was working in the emergency room of the Hospital on the days that the individual patients arrived. Defendant Joseph is a physician who works in the psychiatric ward of the Hospital. Finally, plaintiff Disability Advocates, Inc. ("DAI") is a not-for-profit corporation, "dedicated to providing advocacy and legal representation to people with a diagnosis of mental illness." Complaint par. 5.

As presently filed, the complaint alleges nine causes of action: (1) § 1983; (2) deprivation of liberty without due process, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 6 of the New York State Constitution; (3) that defendants' reliance on the plaintiffs' past diagnoses of mental illness in making the determination to involuntarily commit them violated plaintiffs' rights to equal protection under the Fourteenth Amendment to the United States Constitution and Article I, Section 11 of the New York State Constitution; (4) false imprisonment; (5) battery; (6) assault; (7) negligence with respect to

plaintiff Bagatta; (8) intentional infliction of emotional distress; and (9) negligence.

By this complaint, plaintiffs seek (a) certification of a class; (b) a declaratory judgment declaring that defendants' involuntary commitment based solely on previous diagnoses is unlawful; (c) an injunction enjoining defendants from involuntarily committing individuals unless there is a present finding of a mental illness which poses a substantial risk of serious danger to the individual or others; (d) compensatory and punitive damages; (e) attorneys' fees under § 1988; and (f) costs and disbursements. Plaintiffs also demand a jury trial.

## FACTS

### Plaintiff Rubenstein

According to the complaint, on January 24, 1991, plaintiff Rubenstein went to the New Paltz Police Department complaining of chest pains and shortness of breath. *Id.* par. 14. She requested that the police call an ambulance to take her to an emergency room. *Id.*

Upon arrival, Rubenstein told defendant Dr. Gulati of her chest pains but, rather than treat her physical distress, Gulati allegedly ignored the somatic complaints and instead made a statutory application for an involuntary commitment of plaintiff, pursuant to NYMHL § 9.37.[1] *Id.* par. 17.

Plaintiff alleges that Gulati's application gave no indication that it was based on his own evaluation or that plaintiff posed a substantial risk of physical harm to herself or others. Gulati, allegedly a designee of the director of community services stated "This request is made due to the behavior and/or specific acts described below: Pt. talking continuously; shouting at people; crying intermittently on street as per New Paltz police." *Id.* Plaintiff further alleges that, based upon Gulati's application, plaintiff was physically restrained and transported to and subsequently admitted to Hudson River Psychiatric Center ("HRPC"). *Id.* par. 19.

Rubenstein denies posing a substantial risk of harm to herself or others. *Id.* pars.

---

**1.** The relevant portions of § 9.37 can be found in Appendix A to this opinion.

20–23. She claims she did not consent to being involuntarily committed to HRPC and, finally, asserts that, upon her arrival at HRPC, HRPC did not determine that she posed a substantial risk of physical danger to herself or others. *Id.* par. 25.

*Plaintiff Bagatta*

In September 1990, Bagatta was an outpatient receiving treatment for previously diagnosed mental illness, and taking certain medication in connection with her treatment. Although Bagatta had been hospitalized in the past for the illness, she had not been hospitalized for approximately ten years prior to the events underlying the complaint in this action. *Id.* par. 26.

Around that time, Bagatta's medication was reduced from 50 mg to 10 mg doses, a change "[p]laintiff was having difficulty adjusting to." *Id.* par. 27. According to the complaint, "upon information and belief," on September 17, 1990 Bagatta's parents called the Ulster County Mental Health clinic ("UCMH") to report changes in Bagatta's behavior. UCMH issued a pick up order to be executed by local police officers. *Id.* par. 28. Police allegedly forcibly removed Bagatta from her apartment, in four-point leather restraints, and a Hudson Valley Ambulance ambulance transported her to defendant Hospital's emergency room. *Id.* par. 29.

Again, upon information and belief, defendant Gulati was the admitting physician, allegedly examining plaintiff pursuant to N.Y. Mental Hyg. Law § 9.39.[2] According to plaintiff, Gulati's basis for plaintiff's admission, as stated on the admission form, consisted of the following statements: "Pt. is known to have paranoid schizophrenia. Has not taken medications for one week; scared people are hurting her." Complaint Par. 31.

Bagatta further alleges that Gulati relied on statements of Bagatta's mother to the effect that Bagatta had been confused, unable to sleep and had been reading and underlining the Bible and books about Hit-

ler. *Id.* par. 33. Gulati allegedly notified defendant Joseph of Bagatta's admission. *Id.* par. 34. On September 18, 1990, Bagatta was examined by an as-yet unidentified physician on the psychiatric staff of the Hospital, who stated in writing that Bagatta had the "[p]otential for self endangerment." *Id.* par. 36.

Bagatta alleges that, after the individual defendants labelled her as "uncooperative" and "treatment resistant", they failed to create a properly therapeutic relationship with plaintiff. This allegation is made "particularly" with respect to defendant Joseph. *Id.* par. 37. Bagatta alleges that, as a result of the acts and omissions of the defendants, her condition worsened while she was at the Hospital, which condition continued to exist during a subsequent appearance before a New York State Supreme Court Justice. *Id.* pars. 38–40.[3]

In November 1990, "the defendants" petitioned Judge Bradley of the Ulster County Supreme Court to further retain Bagatta and to medicate her over her objection. The judge dismissed the petition to medicate but ordered Bagatta's transfer to HRPC. *Id.* par. 45. Finally, Bagatta claims to have dramatically improved upon admission to HRPC, voluntarily accepted medication and was soon spending weekends at home. *Id.* pars. 47–49.

A separate set of allegations in the complaint, under the title "Organizational and Class–Wide Plaintiffs," states that the defendants "routinely and systematically involuntarily admit people who are not at the time of admission posing a substantial risk of danger to themselves or others," *id.* par. 52, that such practices "result in widespread denial of liberty without meeting the statutory requirements and without the required due process of law," *id.* par. 53, and that the hospital is liable for the acts and omissions of its employees under *respondeat superior.* *Id.* par. 54.

---

**2.** The relevant portions of § 9.39 may be found in Appendix B to this opinion.

**3.** Bagatta also claims she was denied food and drink in her room, access to dental floss and a dentist, and was subjected to involuntary medication. *Id.* pars. 41–44.

## DISCUSSION

### Applicable Legal Standards

Defendants move for summary judgment and to dismiss. On a motion to dismiss, the district court must construe the complaint's allegations in the light most favorable to the plaintiff and accept the well-pleaded allegations as true. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Wanamaker v. Columbian Rope Co.,* 740 F.Supp. 127, 133 (N.D.N.Y.1990). Summary judgment, on the other hand,

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (citation omitted).

If the movant meets its initial burden of demonstrating that there is no genuine issue as to any material fact, the nonmovant, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *see also Thompson v.*

*Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (all reasonable inferences and any ambiguities are drawn in favor of the nonmoving party).

The mere existence of *some* alleged factual dispute between the parties, however, will not defeat an otherwise properly supported summary judgment motion. Instead, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

The function of the judge "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511. Although to do so would be helpful to a reviewing court, there is no requirement that the trial judge make findings of fact. *See id.* at 250, 106 S.Ct. at 2511.

### 1. *Section 1983 and "State Action"*

All defendants move for summary judgment with respect to the plaintiffs' claim under 42 U.S.C. § 1983.[4] Section 1983 liability is premised upon a finding that a defendant has, under color of state law, deprived a plaintiff of rights secured by the Constitution and laws of the United States. Section 1983 plaintiffs must therefore prove two elements: First, plaintiff must demonstrate that he or she has been deprived of a right secured by the Constitution and the laws of the United States. Second, plaintiff must prove that the defendant depriving plaintiff of such right was acting under color of any statute of the state. *See Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978).[5]

**4.** The relevant portions of the text of § 1983 is as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**5.** The "under color of state law" requirement has been held to be the equivalent of "state action" for the purposes of the Fourteenth Amendment. *See Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982).

All three defendants claim that they did not act under color of state law. The underlying question is whether the alleged infringement of rights by the private actor is "fairly attributable" to the State. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The "fairly attributable" issue is approached in two parts. As the *Lugar* Court stated:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, *or because his conduct is otherwise chargeable to the State.*

*Id.* at 937, 102 S.Ct. at 2753–54 (emphasis added). In addressing the "necessarily fact-bound inquiry that confronts the Court" in these cases, the Court has developed several "factors" or "tests" to determine what makes a private entity or individual a "state actor" for purposes of § 1983. These tests have been characterized as (1) the "public function" test; (2) the "state compulsion" test; (3) the "nexus" test; and, (4), in the case of prejudgment attachments, the "joint action" test.

In *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), plaintiff sued the defendant utility under § 1983 after the defendant terminated its electric service to plaintiff for nonpayment of amounts due. The Supreme Court, rejecting plaintiff's claim that the defendant was a state actor, first stated that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the state for purposes of the Fourteenth Amendment." *Id.* at 350, 95 S.Ct. at 453. One's status as a regulated entity or practitioner (e.g., a doctor) is insufficient, absent more, to convert a private action into state action. *Id.* at 354, 95 S.Ct. at 455.

Instead, said the Court, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 454. The Court first rejected plaintiff's contention that the utility's monopoly status required a finding of state action. *Id.*

The Court then addressed plaintiff's claim that defendant provided an "essential public service", therefore performing a "public function." The Court stated that, although it has "found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State," *id.* at 352, 95 S.Ct. at 454, Pennsylvania courts have rejected the argument that the furnishing of utility services is a state function. The Court further stated that the case would be different "[i]f we were dealing with the *exercise by [the defendant] of some power delegated to it by the State which is traditionally associated with sovereignty,* such as eminent domain." *Id.* at 352–353, 95 S.Ct. at 454 (emphasis added).

In *Flagg Bros., supra,* the Court held that a warehouseman's sale of goods entrusted to him for storage, as permitted under a New York statute, was not "state action." Plaintiffs there claimed that defendant warehouseman deprived them of property without due process of law.

The Court rejected plaintiffs' claim that the state had delegated to defendant powers "traditionally exclusively reserved to the State," reasoning that "the settlement of disputes between debtors and creditors is not traditionally an exclusive public function." 436 U.S. at 161, 98 S.Ct. at 1736. Such "public functions" have included elections, *see, e.g., Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) and *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), and the "company town" phenomenon. *See Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). The Court also stated that

> there are a number of state and municipal functions not covered by our election

cases or governed by the reasoning of *Marsh* which have been administered with a greater degree of exclusivity by States and municipalities than has the function of so-called "dispute resolution." Among these are such functions as education, fire and police protection, and tax collection. We express no view as to the extent, if any, to which a city or State might be free to delegate to private parties the performance of such functions and thereby avoid the strictures of the Fourteenth Amendment.

436 U.S. at 163–164, 98 S.Ct. at 1737.

In *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), one of a trio of cases on the issue that were written during the Court's term that year, plaintiffs were six teachers fired by the board of a private school serving maladjusted adolescents, which school received a large amount of state and federal support. The Court rejected plaintiffs' claim that the acts of the board constituted "state action."

The Court first held that "the school's receipt of public funds does not make the discharge decisions acts of the State." *Id.* at 840, 102 S.Ct. at 2770–71. Second, the discharge decisions were not compelled or even influenced by any state regulation. *Id.* at 841, 102 S.Ct. at 2771. Third, the Court held that, although the education of maladjusted high school students is a public function, the State's mere legislative choice to provide services for such students at public expense does not mean the services were "the exclusive province of the State." *Id.* at 842, 102 S.Ct. at 2772. Fourth, the Court rejected plaintiffs' argument that there existed a "symbiotic relationship" between the school and the State so as to imbue the school's actions with the state's identity.[6]

In *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the Court found that the decisions of private nursing homes and physicians to transfer or dis-charge Medicaid patients did not constitute "state action" for purposes of the Fourteenth Amendment. As in its earlier cases, the Court held that the mere fact that a private entity is subject to extensive regulation by the State is insufficient to convert the entity into a "state actor." A plaintiff must also show that there is a "'sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of latter may be fairly treated as that of the State itself.'" *Id.* at 1004, 102 S.Ct. at 2785–86 (quoting *Metropolitan Edison,* 419 U.S. at 350, 95 S.Ct. at 453).

Second, the Court stated that

although the factual setting of each case will be significant, our precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. [citations omitted]. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment.

*Id.* 457 U.S. at 1004, 102 S.Ct. at 2785–86. Finally, the Court reiterated that "the required nexus may be present if the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'" *Id.* at 1005, 102 S.Ct. at 2786 (quoting *Metropolitan Edison,* 419 U.S. at 353, 95 S.Ct. at 455).

The Court thereafter found tht there was no state action present in that case. Most relevant to the present case, the Court rejected plaintiffs' argument that the federal Medicaid statute and the New York State Constitution made the State responsible for providing every Medicaid patient with nursing home services. *Id.* 457 U.S. at 1011, 102 S.Ct. at 2789. The Court held

---

6. In *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the Court held that the refusal of a restaurant located in a public parking garage to serve blacks constituted state action. The Court rea-soned that the State profited from the discriminatory conduct, since the restaurant was its tenant. This kind of "symbiotic relationship" was not found in *Kohn.*

that the state Constitution only mandated money for the needy, not particular types of care, and that the federal statute only required the State, to be entitled to federal monies, to provide money for services, not provide services themselves. *See id.* Finally, the Court stated that

> Even if respondents' characterization of the State's duties were correct, however, it would not follow that decisions made in the day-to-day administration of a nursing home are the kind of decision traditionally and exclusively made by the sovereign for and on behalf of the public.

*Id.* at 1011–1012, 102 S.Ct. at 2789–90.

The first question on these motions is whether the defendants, in causing plaintiffs to be involuntarily committed, were "state actors," or whether their actions "under the color of state law" so as to be considered "state action."

 The Supreme Court has recognized "repeatedly" that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. *See Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979); *O'Connor v. Donaldson,* 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396 (1974). The *Addington* Court stated:

> The state has a legitimate interest under its parens patriae powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.

441 U.S. at 426, 99 S.Ct. at 1809.[7]

Clearly, then, when a State deprives a person of his or her liberty through civil commitment, the person is entitled to due process safeguards. The question here presented is whether the private actors here involved were acting as the State in involuntarily committing the plaintiffs.

*The Hospital*

 The Hospital claims that it cannot be a "state actor" because "there is simply no proof that government or municipal personnel or agencies played any role in [its] management and governance." Hosp. Mem. at 3–4. To support its position, the Hospital cites *Schlein v. Milford Hosp.,* 561 F.2d 427 (2d Cir.1977), in which the plaintiff doctor sued the hospital under § 1983 for rejecting his staff privileges without procedural due process. The Circuit held that there was no close nexus between the State and the challenged action:

> The State of Connecticut has not been shown to have played any part in the formulation or implementation of the procedures and standards utilized by the Medical Staff and Board of Directors of the Hospital in reaching their decision to reject Dr. Schlein's application for staff privileges. . . .
>
> * * * * * *
>
> Although the State licenses both private hospitals and physicians, it has not required all licensed hospitals to adopt any particular standards or procedures for the granting of staff privileges.

561 F.2d at 429.

The Court further rejected plaintiff's "public function" argument, stating that, "[a]lthough the activities of the Hospital are clearly 'affected with a public interest,' the functions performed by it have not been 'traditionally associated with sovereignty.' " *Id.* at 429 (quoting *Metropolitan Edison,* 419 U.S. at 353, 95 S.Ct. at 455).

This Court is of the opinion, however, that the particular "function" at issue here is fundamentally different than granting

---

**7.** The *O'Connor* court similarly held:

There can be little doubt that in the exercise of its police power a State may confine individuals solely to protect society from the dangers of significant antisocial acts or communicable disease. [citations omitted]. Additionally, the States are vested with the historic *parens patriae* power, including the duty to protect "persons under legal disabilities to act for themselves." [citations omitted]. The classic example of this role is when a State undertakes to act as " 'the general guardian of all infants, idiots, and lunatics.' " [citations omitted].

422 U.S. at 583, 95 S.Ct. at 2497–98.

staff privileges to a physician. As the analysis below will demonstrate, the involuntary commitment decision is one that would satisfy either the "public function" or the "close nexus" test.

Defendants cite three cases, two of which are apparently the only cases where a circuit court of appeals has directly addressed the issue. *See Harvey v. Harvey,* 949 F.2d 1127 (11th Cir.1992); *Spencer v. Lee,* 864 F.2d 1376 (7th Cir.1989) (en banc), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990); *Janicsko v. Pellman,* 774 F.Supp. 331 (M.D.Pa.1991).

*Spencer v. Lee* is the case relied upon by the other two courts finding that a private hospital is not a state actor for purposes of § 1983. In *Spencer,* as in the present case, plaintiff sued the committing doctor and hospital for an involuntary commitment. The Court, rejecting plaintiff's "public function" argument, held that involuntary commitment has not been traditionally the exclusive prerogative of government.

In so holding, the court compared private commitment to other civilian acts bearing the "badge" of acts of the state; for example, private citizens have had the right to effect citizen's arrests, which may require holding someone against their will until proper authorities can effect a formal arrest. Similarly, the court cited acts of self-defense, replevy of goods and removal of trespassers as other situations, not implicating "state action," where a private actor may infringe on someone's freedom without invoking the power of the State. 864 F.2d at 1381 ("[A] private commitment is no more state action than a citizen's arrest, the repossession of chattels, or the ejection of trespassers is.").

Finally, the court also stated that the Illinois statutes there at issue were only 50 years old, implying a lack of government involvement until recently. With respect to that statute, the court stated that, "[i]f Spencer thinks the eight days allowed by Illinois law for confinement prior to hearing is too much, he can challenge the constitutionality of the statute...." *Id.* at 1381.

In *Harvey v. Harvey,* 949 F.2d 1127 (11th Cir.1992), the Eleventh Circuit echoed, and cited, *Spencer* in holding that involuntary commitment was not traditionally the exclusive prerogative of the State, and therefore the hospital was not performing a "public function" making it subject to a § 1983 claims. That court focused on the *exclusivity* portion of the Supreme Court's statement in *Metropolitan Edison,* and held:

> That the private party has power *co-extensive* with the state is irrelevant; [footnote omitted] the public function test shows state action only when private actors are given powers (or perform functions) that are "traditionally the *exclusive* prerogative of the State."

*Id.* at 1131 (quoting *Metropolitan Edison,* 419 U.S. at 353, 95 S.Ct. at 455) (italics in *Harvey*).

As did the *Spencer* court, the *Harvey* court also stressed increased litigiousness as a reason for its finding. The *Harvey* court stated:

> At most, the Georgia statute functions as a licensing provision enabling the hospital to receive mental patients, licensing and regulation are not enough to transform private hospitals into state actors for section 1983 purposes. [citations omitted]. To hold otherwise would expose private hospitals and private physicians to section 1983 liability whenever they act pursuant to the georgia commitment statutes, despite the fact that their actions ultimately reflect medical judgments made according to professional standards that are not established by the state.

*Id.* at 1132; *see also Spencer,* 864 F.2d at 1382 ("[t]he pressure to transform state common law torts into federal constitutional torts comes from the immunities and the damage ceilings that state frequently impose on suits against their public officials....").

Finally, the *Janicsko* court did not specifically address the "public function" test, *see* 774 F.Supp. at 335 n. 3, but instead applied the "close nexus" and "government

compulsion" tests. The court looked to the statute

to determine if it replaces private physician or facility discretion with state mandated standards and to determine whether the state compels or encourages a facility's or physician's actions with regard to involuntary commitment.

*Id.* at 336. The court found that the statute did not compel the commitment of patients by the hospitals, and that the determination of who was "mentally disabled" was left to the discretion of the doctor, "using the non-governmentally imposed criteria of the medical profession...." *Id.* at 339.

Other Courts, however, have found that private involuntary commitment *is* "state action." Most relevant, and persuasive, is *Ruffler v. Phelps Memorial Hosp.*, 453 F.Supp. 1062 (S.D.N.Y.1978), in which the court held a private hospital was performing a "public function" when involuntarily committing a person. The court's analysis was comprised of looking at the hospital's acts and the nature of the statute pursuant to which it confined the plaintiff. *See id.* at 1067.

The court cited statutory provisions in which the state declared that it shares responsibility "for the comprehensively planned care, treatment and rehabilitation of [the state's and its local governments'] mentally ill citizens." *See* N.Y. MENTAL HYG.LAW § 7.01.[8] The statutes also provided (and continue to provide) that (1) private agencies are included among the institutions authorized to participate in the caring for the mentally ill, *see id.* § 7.05(a)(3); (2) the Commissioner of the Office of Mental Health exercises supervisory authority over participating providers, *see, e.g., id.* § 7.17(d) (private operation of programs for mentally ill); *id.* § 31.23(c) (construction of facilities to provide services for the mentally ill); *id.* § 31.01–31.29 (Commissioner issues operating certificates to providers); *id.* § 29.11 (Commissioner's power over patient transfers); and (3) private facilities

can accept voluntary and involuntary admissions, *id.* §§ 9.13, 9.27, 9.31.

The *Ruffler* Court stated

In light of New York's declaration of public policy and governmental responsibility and its extensive regulation of those private agencies engaged in providing mental health services, ... the activities allegedly performed by [defendant] constituted a "public function" sufficient to establish the requisite state action.

\* \* \* \* \* \*

Furthermore ... an independent basis for finding state action is the "comprehensive statutory regulatory scheme ... [which] is persuasive, perhaps compelling, evidence of the degree to which the state has insinuated itself into the actions of the private [hospital," [*Perez v. Sugarman,* 499 F.2d 761 (2d Cir.1974)] at 765, and which effectively makes such hospitals "an integral part of the public operation of providing assistance." *Id.* at 766.

*Ruffler,* 453 F.Supp. at 1069.

Under this reasoning, a private hospital's involuntary commitment would satisfy both the "public function" and the "close nexus" tests. *See Metropolitan Edison,* 419 U.S. at 350, 351, 95 S.Ct. at 453, 454 (in addition to being a regulated entity, there must be a close nexus between the state and the challenged action of the entity).

Significantly, the New York statutory scheme also recognizes the person's liberty interest: "No individual who is or appears to be mentally disabled shall be detained, deprived of his liberty, or otherwise confined *without lawful authority.*" N.Y. MENTAL HYG.LAW § 31.19 (emphasis added). As the *Ruffler* court held, "compliance with the substantive and procedural provisions of New York's Mental Hygiene Law is the single lawful means by which an individual such as Ruffler can be committed and confined against his will by a private institution such as [defendant]." 453 F.Supp. at 1070.

---

**8.** At the time of the *Ruffler* decision, this provision was § 1.03. All statutory citations herein are those presently found in the Mental Hygiene Law.

Although defendant Benedictine Hospital may be correct in claiming that plaintiff relies heavily on *Ruffler v. Phelps Memorial Hosp.*, 453 F.Supp. 1062 (S.D.N.Y.1978), *Ruffler* is not the only court decision with such a holding. There are numerous other cases where a district court has found that a private hospital and/or private physicians may be subject to § 1983 liability when initiating or executing an involuntary civil commitment. *See, e.g., Plain v. Flicker*, 645 F.Supp. 898, 905 (D.N.J.1986) (police power and *parens patriae* power of the state are implicated in civil commitment, and "aris[e] out of the historical responsibility of the sovereign to care for those who are mentally incompetent as well as to protect those who will be harmed if the patient is left at large."); *Davenport v. Saint Mary Hosp.*, 633 F.Supp. 1228 (E.D.Pa.1986) ("Supreme Court decisions suggest that it is exclusively the state's prerogative to confine an individual involuntarily to a mental hospital."); *Brown v. Jensen*, 572 F.Supp. 193, 197 n. 1 (D.Colo. 1983) ("[W]hen physicians and hospitals confine persons pursuant to a mental commitment statute, they are exercising the power of detention delegated to them by the state. Because this power is one historically exercised by the government, the acts of the physicians and hospitals in this connection constitute state action."); *Kay v. Benson*, 472 F.Supp. 850, 851 (D.N.H. 1979) (New Hampshire statutes delegated to private physicians the power of detention, which "is the type of power normally and historically exercised by sovereign states and governmental entities.").

The Second Circuit has given some guidance in determining whether acts of private entities can be considered "public functions" for purposes of § 1983. In *Janusaitis v. Middlebury Volunteer Fire Department*, 607 F.2d 17 (2d Cir.1979), the Second Circuit found that voluntary fire departments were performing a public function because fire protection was traditionally associated with sovereignty. The court looked at the government's interest in the activity, there fire safety, and analyzed the statutes governing voluntary fire departments.

The Court found that the statute "implicitly recognizes that fire-fighting is essentially the exclusive function of government, but a function which may be delegated to a volunteer group by agreement." *Id.* at 24. The court also found support in the statutory language giving firemen the power to order people from buildings on penalty of fine and imprisonment. *See id.; compare* N.Y. MENTAL HYG.LAW § 9.27(i) (physician can call police to take patient into custody); 9.37(e) (same).

In light of the foregoing, this Court holds that the Hospital here is performing a public function when involuntarily committing persons. The statutory scheme is pervasive, there is a close nexus between the state and the activity of the regulated entity, and the power of depriving liberty is one reserved to the State, under either its *parens patriae* or police power. As the *Flicker* court stated, "[i]f the state is not providing the authority to deny an individual his liberty what is providing the authority?" 645 F.Supp. at 905. The Court denies the Hospital's motion for summary judgment on this issue.[9]

*Gulati*

■ Dr. Gulati, the emergency room examining physician, is a "designee" of a county director of community services. According to Linda Ziegler, a secretary with the OMH Hudson River Regional Director, any physician can become a "designee" upon the request of the county community service director, and upon proof of the doctor's current state registration. *See* Ziegler Aff. pars. 2–6.

Since the defendants moved with respect to § 1983 solely on the "state actor" issue, the Court will not address the merits of plaintiffs' claims at this time.

---

9. In reply, the Hospital raises the dangers of exposing private hospitals to § 1983 liability. *See* Hosp.Reply Mem. at 5. The only issue here presented, however, is whether the private entity is acting as a state actor, not whether, *as a matter of policy,* there should be less lawsuits involving hospitals and physicians.

Although counsel for Gulati goes to great lengths to explain how little it takes to become a designee, he fails to explain what the designee status entitles him to do. A reading of § 9.37 reveals that a designee is entitled, *inter alia*, to take into custody, detain, and transport a patient, after signing an application for the involuntary commitment, as well as direct peace officers and/or police officers to take into custody and transport the patient. *See* N.Y. MENTAL HYG.LAW § 9.37(e).

As a designee of a county official, Gulati's claim not to be a state actor is less convincing or troubling than the Hospital's. His motion on this issue is therefore denied.

*Dr. Joseph*

Joseph makes the same arguments as the other defendants with respect to determining whether the "close nexus," "state compulsion" or "public function" tests are met here. Because Joseph has raised a question as to whether he is properly a party to this action, however, the Court will not address his motions until that question is resolved. *See* discussion, *infra*.

### 2. *Separate Due Process and Equal Protection Claims*

As stated *supra*, in plaintiffs' second and third causes of action claim that defendants (a) deprived them of liberty without due process, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 6 of the New York State Constitution; and (b) violated plaintiffs' rights to equal protection under the Fourteenth Amendment to the United States Constitution and Article I, Section 11 of the New York State Constitution by relying on the plaintiffs' past diagnoses of mental illness in making the determination to involuntarily commit them.

Defendants move for summary judgment on these claims. The Hospital argues that these claims comprise a *Bivens* action, *see Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), under which a plaintiff may seek damages for constitutional violations by persons acting under color of federal law. The Hospital also cites *Turpin v. Mailet*, 591 F.2d 426, 427 (2d Cir.1979), *cert. denied sub nom., Turpin v. City of West Haven*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), in which the Second Circuit held that, given the availability of relief under § 1983, there can be no cause of action against a municipality directly under the 14th Amendment. Defendant Gulati essentially repeats the Hospital's position.

Plaintiffs point out, in response, that they are seeking, along with class certification, a declaratory judgment declaring that defendants' involuntary commitment based solely on previous diagnoses are unconstitutional under the federal and state constitutions, and an injunction enjoining defendants from involuntarily committing individuals unless there is a present finding of a mental illness which poses a substantial risk of serious danger to the individual or others. Although defendants are correct in asserting that no independent claim for damages directly under the constitutional provisions may be maintained, plaintiffs' request for declaratory and injunctive relief are not improper.

As recognized by both defendant Gulati and plaintiff, a claim seeking injunctive relief under the Fourteenth Amendment requires that there be "state action." As stated *supra* at note 5, the "under color of law" requirement of § 1983 claims is co-extensive with the "state action" requirement under the Fourteenth Amendment. *See Rendell–Baker v. Kohn*, 457 U.S. at 838, 102 S.Ct. at 2769–70. Given that the analysis is the same and the requisite "state action" has been shown in the earlier discussion under § 1983, the motions for summary judgment dismissing plaintiffs' second and third claims, which seek declaratory and injunctive relief directly under the Fourteenth Amendment, are denied.

### 3. *Standing*

The defendants move to dismiss plaintiff Disability Advocates, Inc. ("DAI") for lack of standing. Defendant Gulati, whose argument is adopted by the Hospital, argues that DAI's role in litigation such as the present case is that of an

*advocate,* not a party. Citing *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), Gulati alleges that DAI does not, and cannot, assert that it has personally suffered an "injury in fact." In *Valley Forge,* the Supreme Court observed:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant" [citation omitted] ... and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." [citation omitted].

> \* \* \* \* \* \*

> The exercise of judicial power, which can so profoundly affect the lives, liberty, and property of those to whom it extends, is therefore restricted to litigants who can show "injury in fact" resulting from the action which they seek to have the court adjudicate.

454 U.S. at 472–473, 102 S.Ct. at 758–59.

DAI asserts that it has standing pursuant to its status as a "Protection and Advocacy System for Mentally Ill Individuals" in New York State. Such status is conferred under the Protection and Advocacy System for Mentally Ill Individuals Act ("The Act"), 42 U.S.C. §§ 10801-10827. The purposes of the Act are "to ensure that the rights of mentally ill individuals are protected," and "to assist States to establish and operate a protection and advocacy system for mentally ill individuals" to effectuate such protection through advocacy and investigation. *Id.* § 10801(b)(1) & (2).

According to DAI, the New York State Commission on Quality of Care for the Mentally Disabled received New York's allotment under the Act, and thereafter entered into contracts with six non-profit corporations, including DAI. *See* Pl.Mem. at 34. DAI "provides protection and advocacy services to individuals with mental illness in the Hudson Valley Region." *Id.*

DAI claims that it has the authority, under the Act, to maintain the instant action. Specifically, the statute provides as follows:

> (a) A system established in a State ... to protect and advocate the rights of mentally ill individuals shall—
> (1) have the authority to—

> \* \* \* \* \* \*

> (B) pursue administrative, legal, and other appropriate remedies to ensure the protection of mentally ill individuals who are receiving care or treatment in the State; and
> (C) pursue administrative, legal, and other remedies on behalf of an individual who—
> (i) was a mentally ill individual; and
> (ii) is a resident of the State,
> but only with respect to matters which occur within 90 days after the date of the discharge of such individual from a facility providing care or treatment....

42 U.S.C. § 10805(a). Although the legislative history sheds no light on the issue, *see generally,* SEN.REP. No. 109, 99th Cong., 2d Sess. 5, *reprinted in* 1986 U.S. CODE CONG. & ADMIN.NEWS 1361, 1365; H.R.CONF.REP. No. 576, 99th Cong., 2d Sess. 15–23, *reprinted in* 1986 U.S.CODE CONG. & ADMIN.NEWS 1377–1385, the language of subsection (a)(1)(B) clearly confers upon a "system," and thus the entities with which it contracts, the right to "pursue ... legal remedies to ensure the protection of mentally ill individuals who are receiving care or treatment in the State."

DAI also relies *Goldstein v. Coughlin,* 83 F.R.D. 613 (W.D.N.Y.1979), in which Judge Curtin found that, in light of statutory language very similar to that at issue here, but concerning persons with developmental disabilities, *see* 42 U.S.C. §§ 6001–81, plaintiff Protection and Advocacy System for Developmental Disabilities, Inc. ("PASDD") did not need to show injury to itself in order to have standing to bring the action. *See Goldstein,* 83 F.R.D. at 614 ("Given the Congressional purpose to provide retarded persons with legal representation as revealed in § 6012, and given

PASDD's responsibilities as the designated advocacy system for this state, PASDD need show no injury to itself in order to have standing in this action.").

Given the broad remedial purposes of the Act, and the statutory language apparently conferring a right upon entities such as DAI to pursue legal remedies such as those sought through the present lawsuit, the defendants' motion to dismiss DAI for lack of standing is denied.[10]

### 4. Pendent State Law Claims

Given that the Court has jurisdiction of the federal claims, defendants' motions seeking dismissal of the pendent state law claims for lack of federal subject matter jurisdiction are denied.

### 5. Defendant Joseph

Defendant Joseph moves to dismiss the complaint as to him for lack of personal jurisdiction. He states that a summons and complaint, dated September 16, 1991, were delivered to his secretary at his office on or about September 26, 1991, and that he was never personally served, nor served by mail at his home or office. *See* Joseph Aff. par. 18.

Plaintiffs have submitted an affidavit of the process server stating that Joseph was in fact served personally. *See* Byer Aff. pars. 1–7. Byer states that he went to the Resident's Building of Benedictine Hospital and entered Joseph's office. *Id.* par. 4. He encountered a man and a woman, asked the woman if Dr. Joseph was in, whereupon Joseph identified himself, the server informed Joseph that the server had legal papers for him, handed Joseph the papers and left the office. *Id.* pars. 5–6. Byer has attached a copy of the invoice sent to DAI for effecting the service. *See id.* Ex. 2.

Given the clear factual dispute, the Court must hold a fact-finding hearing on the issue. Upon a determination of the issue, the Court will, if necessary, reach Joseph's motions.

### 6. Defendant Gulati

Defendant Gulati, the physician who met and examined both Bagatta and Rubenstein in the emergency room, has moved to dismiss the state law claims for failure to state a claim or, in the alternative, for summary judgment.

*False Imprisonment*

Relying on *Gonzalez v. State*, 110 A.D.2d 810, 488 N.Y.S.2d 231 (2d Dept. 1985), *appeal dismissed*, 67 N.Y.2d 647, 490 N.E.2d 559, 499 N.Y.S.2d 1032 (1986), Gulati claims that his conduct is privileged as a matter of law, since he acted in compliance with the pertinent provisions of the Mental Hygiene Law. He has submitted an affidavit describing his encounters with both named plaintiffs.

The elements of false imprisonment are as follows: (1) defendant intended to confine plaintiff; (2) plaintiff was conscious of the confinement; (3) plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *See Parvi v. Kingston*, 41 N.Y.2d 553, 556, 362 N.E.2d 960, 394 N.Y.S.2d 161 (1977); *Broughton v. State*, 37 N.Y.2d 451, 335 N.E.2d 310, 373 N.Y.S.2d 87, *cert. denied sub nom.*, *Schanbarger v. Kellogg*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975); *Gonzalez*, 110 A.D.2d at 812–13, 488 N.Y.S.2d at 233.

In *Gonzalez*, the plaintiff was involuntarily committed to a state hospital after being found grinning inappropriately while lying on subway tracks. Plaintiff sued for false imprisonment. The Second Department held that, while the burden of proving privilege is upon the person or entity charged with the commission of the tort, the facts in the record demonstrated that there was a sufficient basis upon which the defendant could invoke the privilege. 488 N.Y.S.2d at 233.

The Court held that, although some of the evidence suggested that the plaintiff was not suicidal or delusional at the time of

---

**10.** Because the Court finds standing under the statute, it is not necessary to address DAI's alternative standing arguments based upon (1) a "trend" in New York state courts to broaden standing requirements, *see, e.g., Mixon v. Grinker*, 157 A.D.2d 423, 556 N.Y.S.2d 855 (1st Dept. 1990); and (2) "organizational" standing.

his admission, hospital records contained several statements that plaintiff had exhibited signs of psychosis "as manifested by impaired insight and judgment, vague auditory hallucinations and vague suicidal thoughts." *Id.*

The Court further stated that the events leading up to the detention are relevant with respect to a determination of privilege. *Id.* The court, finding that "[t]he evidence adduced at trial provided enough of a basis to find privilege in accordance with the statutory requirements of the Mental Hygiene Law," *id.* 488 N.Y.S.2d at 234, reversed the trial court (Court of Claims) ruling in favor of plaintiff.

■ Here, defendant Gulati moves for summary judgment, which requires, initially, that he demonstrate that there is no genuine issue of material fact. Moreover, Gulati bears the burden of demonstrating the applicability of the privilege.

As to Rubenstein, who was brought to the emergency room by the New Paltz Rescue Ambulance Squad at the request of the New Paltz Police, Gulati's affidavit reveals that he personally examined her and found that she was generally in good physical condition, but was demonstrating rapid flight of ideas. *See* Gulati Aff. par. 11. He further learned that she had stopped taking her medications; Lithium, which is prescribed for "bi-polar disorder," and Stelazine, an antipsychotic drug. *Id.* par. 12. Rubenstein also complained about an individual named Ellen Ganzer who, Rubenstein claimed, "bothered" her a great deal. *Id.* par. 13.

The emergency room record filled out by Gulati reveals that he was told by the ambulance crew that Rubenstein had been observed walking in the street, yelling at people and crying intermittently. *See id.* Ex. C. Gulati diagnosed Rubenstein's condition as bi-polar affective disorder and sought her admission at Benedictine. A Dr. Amin informed Gulati that Benedictine was full, and recommended a transfer to HRPC. *See* Gulati Aff. pars. 14–15. Gulati thereafter filled out the Application for Involuntary Admission pursuant to N.Y.

MENTAL HYG.LAW § 9.37 (*see* note 1, *supra*).

Gulati states that, in making his recommendation for transfer to HRPC, he had determined, through his examination and interview with Rubenstein, that she posed a substantial risk of physical harm to others. This conclusion was based upon her agitated state and her behavior pattern which indicated the manic phase of her bipolar affective disorder. According to Gulati, while patients are in their manic phase, they are often

> destructive to persons or property in order to draw attention to themselves, and Ms. Rubenstein's focus on the "bothersome" Ellen Ganzer indicated to me that she may have indeed picked out a subject upon whom to take out her manic aggressiveness.

*Id.* par. 17.

Gulati's observations were verified by a registered nurse ("RN") who completed an Emergency Room Supplementary Sheet, in which the RN stated that Rubenstein was excited, talking rapidly, and had flight of ideas, "which caused security to be summoned in order to prevent any potential disturbance." *Id.* par. 18; *see id.* Ex. E.

In opposition, Rubenstein has submitted her own affidavit controverting the factual recitation of Gulati. She states that she went to the New Paltz Police Department with chest pains and shortness of breath, and asked the police to call an ambulance to take her to the emergency room. *See* Rubenstein Aff. par. 2. She states that Gulati's "examination" of her lasted less than one minute. *Id.* par. 8. She also states that she had no plans to do any harm to Ellen Ganzer, and did not speak of any plans to do so. *Id.* par. 12.

Rubenstein has not, however, submitted an affidavit of another physician or psychiatrist stating that, faced with the same presenting symptoms, it would be unreasonable, and therefore not privileged, for the treating physician to fill out an application for an involuntary commitment. Gulati has met his burden of demonstrating that his acts were privileged, and plaintiffs have not raised a question of fact concern-

ing the privilege. The motion is therefore granted.

Plaintiff Bagatta was the subject of a "pick-up order" prepared by an RN at the Ulster County Mental Health Services. *See* Gulati Aff.Ex. F. The RN reported that Bagatta "has been reported to be decompensating over the last week since she stopped taking her medication." *Id.* She further reported that Bagatta had been unable to sleep, was confused and paranoid, reading and underlining the Bible, reading books on Hitler and women murderers, bizarrely dressed, hyperactive, swearing and denying any problems. *Id.* As stated *supra*, Bagatta arrived at the emergency room already restrained. *See id.* Ex. G (Ambulance company's Prehospital Care Report).[11]

Gulati states that he began to personally examine Bagatta but was unable to complete the examination due to her lack of cooperation. Gulati concluded that Bagatta posed a substantial risk of harm to herself and to others, diagnosed her as suffering from paranoid schizophrenia, decompensated phase, and had her admitted to the Hospital on an emergency basis. *See id.* par. 28; *see also id.* Ex. L.

Given the *Gonzalez* court's holding that the facts leading up to the involuntary commitment are relevant, which facts in Bagatta's case are numerous, Gulati's conduct is privileged. Plaintiffs have not submitted an affidavit of a physician or psychiatrist raising a question as to the reasonableness of Gulati's conduct. In addition, the controlling statute requires only that the physician find that the patient manifest

> substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm *or other conduct demonstrating that he is dangerous to himself....*

N.Y. MENTAL HYG.LAW § 9.39 (emphasis added). The motion is granted.

**11.** Although Gulati's affidavit states that Bagatta "ultimately had to be placed in four point leather restraints, and security was summoned," Gulati Aff. par. 28, both the Prehospital Care Report and Bagatta's own affidavit state that she

*Battery*

To recover damages for battery founded on bodily contact, a plaintiff must prove that there was bodily contact, that the contact was offensive, and that the defendant intended to make the contact. *See Laurie Marie M. v. Jeffrey T.M.*, 159 A.D.2d 52, 55, 559 N.Y.S.2d 336, 338 (2d Dept.1990), *aff'd*, 77 N.Y.2d 981, 575 N.E.2d 393, 571 N.Y.S.2d 907 (1991). The complaint in this case alleges that plaintiff Rubenstein suffered "offensive touchings" at the *Hudson River Psychiatric Center* as a result of the acts of defendants, and that "[t]hese touchings occurred at the hands of defendant hospital's staff and defendant Gulati." Complaint par. 73. Oddly, Gulati was working in the emergency room of *Benedictine* Hospital.

Plaintiffs also state that Rubenstein's restraint in four-point leather straps "arose out of an involuntary commitment," can be ordered only by a physician except in an emergency situation, and that Gulati, "as the physician responsible for the events in the emergency room ... was legally responsible for the harmful contact." Pl. Mem. at 28.

The complaint further state that, "[b]ased upon defendant Gulati's above application [to involuntarily commit Rubenstein], ... plaintiff was physically restrained without her consent, involuntarily transported and subsequently admitted to [HRPC]." Complaint par. 19. Bagatta apparently arrived at the Hospital already restrained, however, and remained uncooperative while in the emergency room. Given that Bagatta did not allow Gulati to examine her, it is difficult to understand how she could charge him with battery.[12]

Moreover, since it has been determined that Gulati's acts with respect to the involuntary commitment were privileged, the motion is granted.

had to be restrained to be taken to the ambulance, *prior* to traveling to the emergency room.

**12.** It is important to note that it has not been alleged that Gulati forcibly medicated Bagatta.

## Assault

■ The language of the complaint merely asserts that "[t]he defendants' committed an intentional act which threatened contact with the plaintiffs and caused apprehension of hostile and unauthorized contact on the part of the plaintiffs," complaint par. 79, and that the defendants had the ability to cause hostile contact with the plaintiffs as evidenced by their "willingness to ... inappropriately exercise sweeping authority under [Mental Hygiene Law] Article 9." *Id.* par. 78. An assault claim requires allegations that the plaintiff has been put in imminent apprehension of harmful or offensive contact. *See, e.g., Hayes v. Schultz,* 150 A.D.2d 522, 541 N.Y.S.2d 115, 116 (2d Dept.1989); *see also Mason v. Cohn,* 108 Misc.2d 674, 438 N.Y.S.2d 462, 464 (N.Y.Sup.Ct.1981) ("Civil assault is defined generally as an intentional attempt or threat to do injury or commit a battery.").

■ Given that Gulati's motion is for summary judgment, it is incumbent on plaintiffs to demonstrate that there is a question of fact concerning the assault claim. Neither Bagatta's nor Rubenstein's affidavit contains any allegation that Gulati threatened plaintiffs with physical harm, nor that plaintiffs were in fear of such harm. The motion is therefore granted.

## Negligence

Plaintiffs' seventh cause of action, apparently limited to plaintiff Bagatta, alleges that defendants breached their duty to provide the appropriate quality of care and treatment in accordance with N.Y. MENTAL HYG.LAW ART. 33. Bagatta alleges that the breach of this duty renders defendants liable for negligence. Plaintiffs' ninth cause of action, also sounding in negligence, alleges that the defendants breached their duties under N.Y. MENTAL HYG.LAW ART. 9, by unlawfully committing plaintiffs to the Hospital.

■ Gulati characterizes plaintiffs' seventh and ninth causes of action as medical malpractice. Plaintiffs claim in response that their claims do not arise from the physician-patient relationship, but from statutory and regulatory provisions creating other rights in patients and concomitant duties in treatment providers such as defendants. *See* Pl.Mem. at 27–28. As counsel states, "[i]t is for the injuries which Ms. Bagatta suffered, caused by the defendants breach of these statutory duties, which are the basis for the claim of negligence." *Id.* at 29.

In *Stanley v. Lebetkin,* 123 A.D.2d 854, 507 N.Y.S.2d 468, 468 (2d Dept.1986), the Second Department held that

> *The critical question in determining whether an action sounds in medical malpractice or simple negligence is the nature of the duty to the plaintiff which the defendant is alleged to have breached.* [citation omitted]. When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence.

(emphasis added).

Initially, given that the ninth cause of action solely concerns the involuntary commitment under Article 9, and it has previously been determined that Gulati's actions in that regard are privileged, summary judgment on the ninth cause of action is granted.

As to the seventh cause of action, limited to Bagatta; except for one allegation, to wit, that plaintiffs "were abused and mistreated by defendants Gulati and Joseph ...," *see* Pl.Mem. at 31, all of the negligence allegations concern conduct *following* Bagatta's admission to the Hospital. Gulati states, and plaintiff does not controvert, that, after Bagatta's admission to the Hospital, he did not see or come into contact with her again. *See* Gulati Aff. par. 34.

As to the one allegation naming Gulati, plaintiffs have not demonstrated any "abuse" or "mistreatment" so as to overcome the privilege already held by this Court to apply to Gulati's actions involving the involuntary commitment. Gulati's motion is therefore granted.

*Intentional Infliction*

■ Finally, Gulati moves for summary judgment on plaintiff's eighth cause of action, for intentional infliction of emotional distress. That claim alleges the distress based upon defendants' intentional and reckless acts connected with the involuntary commitments of plaintiffs, when "plaintiffs were not in fact posing a substantial risk of serious harm to themselves or others as is required under the law." Complaint pars. 85 & 87. The complaint alleges that plaintiffs suffered damages as a result of "the defendants' extreme and outrageous conduct," *id.* par. 86, such damages comprised of a deterioration of their psychiatric condition. *See id.* pars. 86 & 88.

The tort of intentional infliction of emotional distress has been characterized as "extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143, 480 N.E.2d 349, 490 N.Y.S.2d 735 (1985); *see also, Fischer v. Maloney*, 43 N.Y.2d 553, 557, 373 N.E.2d 1215, 402 N.Y.S.2d 991 (1978) (Court of Appeals adopts Restatement Second of Torts § 46(1)); *Murphy v. American Home Products*, 58 N.Y.2d 293, 303, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983).

Plaintiffs assert, in their Memorandum of Law, that "[b]oth women were stripped of their liberty with the force of physical restraints upon the order of defendant Gulati," Pl.Mem. at 32, and that such conduct satisfies the "outrageous conduct" requirement of an intentional infliction claim. Given that Gulati's conduct in the emergency room has been held to be privileged, the motion for summary judgment is granted.

### 7. *Plaintiffs' Cross–Motions*

Plaintiffs cross-move to (1) amend the complaint to add a named plaintiff and add two causes of action of that plaintiff against defendants Joseph and Benedictine Hospital, and (2) for certification of the class. Initially, plaintiffs' motion to amend the complaint is granted.[13]

■ As to the class certification, the class plaintiffs seek to represent is comprised of

individuals who have been or will be in the future improperly and unlawfully committed to defendant Benedictine Hospital under color of the Mental Hygiene Law by the acts and/or omissions of defendants Joseph and Gulati, and unidentified staff physician.

Proposed Amended Complaint par. 13. Plaintiffs seek certification under Fed. R.Civ.P. 23(a) & (b)(2).

To be entitled to class certification, the plaintiffs must establish the numerosity, commonality, typicality and adequacy of representation requirements of Fed. R.Civ.P. 23(a). *See, e.g., Follette v. Vitanza*, 658 F.Supp. 492, 505 (N.D.N.Y.1987). This plaintiffs have failed to do.

As to numerosity, plaintiffs' counsel has submitted an affidavit in reply, stating that, according to the Mental Hygiene Legal Services, there were over 330 involuntary admissions at defendant Benedictine Hospital during 1990, and 400 of such admissions in 1991. *See* Clune Aff. pars. 4 & 5. This Court need not, however, address the question of whether merely listing the number of involuntary commitments, without alleging that *all* such commitments were in violation of the law, is sufficient for the purposes of class certification, because the Court finds that plaintiffs have not satisfied the commonality requirement.

As cogently pointed out by defendants, commitment decisions are fact-specific, requiring, in each case, a finding of "dangerousness," either to self or to others, of the individual to be committed. That this is a fact-specific inquiry is evident by a review of the allegations of the three named plaintiffs. Plaintiff Bagatta was committed pursuant to N.Y. Mental Hyg.Law § 9.39. Plaintiff May alleges that she voluntarily sought inpatient treatment, only to discover later that she had been involuntarily committed. Although it is alleged that defendant Gulati filled out an application un-

---

**13.** Plaintiffs' initial failure to file the proposed amended complaint was cured when such complaint was submitted with plaintiffs' reply papers.

der N.Y. MENTAL HYG.LAW § 9.37 plaintiff Rubenstein was *not* committed at all to defendant Benedictine Hospital, nor, apparently, to HRPC, to which she was transferred from Benedictine's emergency room.

Given such a fact-specific inquiry, this Court is not inclined to certify the class, since it would still be necessary to address the facts and circumstances surrounding each and every plaintiff's involuntary commitment.[14] The motion is therefore denied.

It is therefore ORDERED, that the issue of whether defendant Joseph was properly served with a copy of the summons and complaint must be decided at a hearing to be scheduled, and

It is further ORDERED, that defendants' motions for summary judgment dismissing the § 1983 claim are denied, and

It is further ORDERED, that defendants' motions for summary judgment dismissing plaintiffs' second and third claims are denied, and

It is further ORDERED, that defendants' motions to dismiss plaintiff DAI for lack of standing are denied, and

It is further ORDERED, that defendant Gulati's motion for summary judgment dismissing the pendent state law claims is granted in its entirety, and

It is further ORDERED, that plaintiffs' cross-motion to amend the complaint is granted, and

It is further ORDERED, that plaintiffs' cross-motion for class certification is denied.

## APPENDIX A

The relevant portions of N.Y. MENTAL HYG.LAW § 9.37, referred to in the text accompanying note 1, *supra*, are as follows:

(a) The director of a hospital, upon application by a director of community services or an examining physician duly designated by him or her, may receive and care for in such hospital as a patient any person who, in the opinion of the director of community services or the director's designees, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others.

The need for immediate hospitalization shall be confirmed by a staff physician of the hospital prior to admission. Within seventy-two hours ... after such admission, if such patient is to be retained for care and treatment beyond such time and he or she does not agree to remain in such hospital as a voluntary patient, the certificate of another examining physician who is a member of the psychiatric staff of the hospital that the patient is in need of involuntary care and treatment shall be filed with the hospital. From the time of his or her admission under this section the retention of such patient for care and treatment shall be subject to the provisions for notice, hearing, review, and judicial approval of continued retention or transfer and continued retention provided by this article for the admission and retention of involuntary patients, provided that, for the purposes of such provisions, the date of admission of the patient shall be deemed to be the date when the patient was first received in the hospital under this section.

(b) The application for admission of a patient pursuant to this section shall be based upon a personal examination by a director of community services or his designee. It shall be in writing and shall be filed with the director of such hospital at the time of the patient's reception, together with a statement in a form prescribed by the commissioner giving such information as he may deem appropriate.

(c) Examining physicians designated by the director of community services shall be approved by the commissioner. A designee shall continue to have the power to act under this section until a certificate revoking his designation is filed by the officer appointing him or by a succes-

---

**14.** Given the inability of plaintiffs to satisfy the commonality requirement, the Court will not address its similar reservations with respect to plaintiffs' ability to satisfy the typicality requirement.

sor to such officer of by the commissioner.

\* \* \* \* \* \*

(e) After signing the application, the director of community services or the director's designee shall be authorized and empowered to take into custody, detain, transport, and provide temporary care for any such person. Upon the written request of such director or the director's designee it shall be the duty of peace officers, when acting pursuant to their special duties, or police officers who are members of the state police or of an authorized police department or force or of a sheriff's department to take into custody and transport any such person as requested and directed by such director or designee. Upon the written request of such director or designee, an ambulance service, as defined in subdivision two of section three thousand one of the public health law, is authorized to transport any such person.

N.Y. MENTAL HYG.LAW § 9.37 (McKinney's 1988 and Supp.1992).

## APPENDIX B

The relevant portions of N.Y. MENTAL HYG.LAW § 9.39, as referred to in the text accompanying note 2, *supra,* are as follows:

(a) The director of any hospital maintaining adequate staff and facilities for the observation, examination, care, and treatment of persons alleged to be mentally ill and approved by the commissioner to receive and retain patients pursuant to this section may receive and retain therein as a patient for a period of fifteen days any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others. "likelihood to result in serious harm" as used in this article shall mean:

1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or

2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

\* \* \* \* \* \*

The director shall admit such person pursuant to the provisions of this section *only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of this section.* Such person shall not be retained for a period of more than forty-eight hours unless within such period such finding is confirmed after examination by another physician who shall be a member of the psychiatric staff of the hospital.... If at any time after admission, the patient, any relative, friend, or the mental hygiene legal service gives notice to the director in writing of request for court hearing on the question of need for immediate observation, care, and treatment, a hearing shall be held as herein provided as soon as practicable but in any event not more than five days after such request is received, except that the commencement of such hearing may be adjourned at the request of the patient.

\* \* \* \* \* \*

(b) Within fifteen days of arrival at the hospital, if a determination is made that the person is not in need of involuntary care and treatment, he shall be discharged unless he agrees to remain as a voluntary or informal patient. If he is in need of involuntary care and treatment and does not agree to remain as a voluntary or informal patient, he may be retained beyond such fifteen day period only by admission to such hospital or another appropriate hospital pursuant to the provisions governing involuntary admission on application supported by medical certification and subject to the provisions for notice, hearing, review, and judicial approval of retention or transfer and retention governing such admissions....

N.Y. MENTAL HYG.LAW § 9.39(a) & (b) (emphasis added).