## TENNESSEE PROTECTION AND ADVOCACY, INC.

v.

## BOARD OF EDUCATION OF PUTNAM COUNTY, TENNESSEE.

No. 2–98–0036.

United States District Court,
M.D. Tennessee,
Northeastern Division.

Oct. 20, 1998.

er, President, Direct Dial Audio Corporation (Mar. 10, 1995).

810

J. Page Garrett, Tennessee Protection and Advocacy, Inc., Nashville, TN, for Plaintiffs.

Daniel Hurley Rader, III, Moore, Rader, Clift & Fitzpatrick, P.C., Cookeville, TN, Melinda H. Maloney, Knoxville, TN, Charles L. Weatherly, The Weatherly Law Firm, Atlanta, GA, for Defendants.

## MEMORANDUM

WISEMAN, Senior District Judge.

Before the Court is defendant's motion to dismiss complaint for (1) lack of standing, (2) failure to state a claim upon which relief may be granted, and (3) failure to exhaust administrative remedies. Also before the Court are plaintiff's motion to amend complaint and supplemental brief in opposition to the motion to dismiss, and defendant's responsive motion to strike pleadings. For the reasons set forth below, the Court GRANTS defendant's motion to dismiss on the basis of lack of standing. The Court has considered plaintiff's proposed amended complaint and concludes that it does not cure plaintiff's lack of standing. Plaintiff's motion to amend its complaint is therefore DENIED. Although the Court considers the cases cited in plaintiff's Supplemental Brief in the discussion below, it finds that filing of that brief was in direct violation of Magistrate Judge Griffin's Order of June 8, 1998 that no other filings in support of or opposition to the motion to dismiss would be permitted without the express permission of the Court. (*See* Doc. 22 at 1.) Defendant's motion to strike is therefore GRANTED.

## I. RELEVANT BACKGROUND

Tennessee Protection and Advocacy (TPA), the plaintiff, has filed suit against the defendant Putnam County Board of Education (Putnam County), claiming that under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.*, Putnam County is obligated to provide physical and occupational therapy "as may be required to assist a child with a disability to benefit from special education and related services." 20 U.S.C. § 1401(22). TPA argues that IDEA establishes professional standards for individuals who provide such therapy, *see* 20 U.S.C. § 1412(a)(15), and that Putnam County, as a matter of policy, does not provide physical or occupational therapy to the disabled students in its school system except through "unqualified personnel." (Compl.¶ 6.C.) Presumably, TPA means that the personnel who function as therapists in the Putnam County school system are not actually licensed therapists. As an example, TPA claims that "a gym teacher who illegally provides physical therapy is held out to parents of children with disabilities as a 'motor therapist.'" (Compl. ¶ 6.B.) TPA claims standing under 42 U.S.C. § 6042(a), which says in relevant part:

In order for a State to receive [federal funds] under … this chapter—

(1) the State must have in effect a system to protect and advocate the rights of individuals with developmental disabilities;

(2) such system must—

(A) have the authority to—

(i) pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the State who are or may be eligible for treatment, services, or habilitation …;

(B) have the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred….

42 U.S.C. § 6042(a). It is undisputed that TPA is that system designated by Tennessee pursuant to § 6042. In that capacity, TPA seeks unspecified damages under § 1983, and requests a permanent injunction requiring Putnam County to comply with TPA's view of the governing law, and compensatory services for children who have not received occupational and physical therapy as required

by federal and state law. In one of TPA's responses to Putnam County's motion, it states that its claim boils down to the "purely legal" question of whether it is legal for Putnam County "to use non-licensed personnel to provide physical therapy to disabled students." (Pl.'s Resp. to Def.'s Rep. to Pl.'s Resp. to Mot. Dismiss at 2.)

█ Putnam County argues that TPA's complaint fails for three reasons. First, it denies that TPA has standing under 42 U.S.C. § 6042 to bring this claim. Its position is that because TPA neither claims a direct injury-in-fact to the organization itself nor brings suit on behalf of named individuals with specific injuries, then it does not have standing, and therefore this Court should dismiss the complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction.[1] Second, Putnam County argues that TPA's complaint should be dismissed for failure to state a claim upon which relief may be granted, in that the complaint "does not allege any factual or legal basis to support its allegations that the school system has deviated from the requirements of the IDEA or state law." (Def's Mem. Supp. Mot. Dismiss at 7.) Third, Putnam County argues that TPA's claim should be dismissed because it has failed to exhaust administrative remedies as required by the IDEA. Because the Court determines that the complaint must be dismissed for lack of standing, it does not reach the issue of exhaustion of administrative remedies or the request for dismissal on Rule 12(b)(6) grounds.

TPA has also filed a motion to amend its complaint and a "Supplemental Brief" in opposition to the motion to dismiss. These documents were filed more than three months after the last permitted response to the motion to dismiss. In its proposed amended complaint, TPA seeks to comply with "any pleading requirements allegedly

imposed on [TPA] by the Supreme Court's decision in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-63, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)." (Pl.'s Supp. Br. at 1.) Accordingly, in its proposed amended complaint, TPA alleges that "[c]hallenging Defendants' [sic] conduct in this case has caused Tennessee Protection and Advocacy, Inc. to take money away from its vital, ongoing, federally mandated information and referral services and put that money instead into funding direct litigation services in this particular case." (Proposed Compl. ¶ 30.) In other words, because it has devoted resources to litigation, TPA alleges that it has suffered injury-in-fact directly resulting from the allegedly illegal activities of the Putnam County Board of Education. In its supplementary brief, TPA cites some additional authority for its position that devotion of resources to litigation is sufficient to give it Article III standing. The Court will address those cases in the discussion of standing, below.

## II. LEGAL STANDARDS

### A. Rule 12(b)(1) Motion to Dismiss

█ The Sixth Circuit has adopted two standards of dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir.1990). A facial attack merely questions the sufficiency of the pleading. In reviewing a facial attack, the Court applies the same standard applicable to Rule 12(b)(6) motions. On the other hand, where a court reviews a complaint under a factual attack, no presumptive truthfulness applies to the factual allegations. In such cases, the Court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve disputed jurisdictional

---

1. Putnam County initially argued for dismissal under Rule 12(b)(2), but that should not make any difference in the Court's decision whether to dismiss. *See Snyder v. Smith,* 736 F.2d 409, 419 (7th Cir.1984) (overlooking erroneous labeling of motion to dismiss), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984), *overruled on other grounds by Felzen v. Andreas,* 134 F.3d 873 (7th Cir.1998). *See also Peckmann v.*

*Thompson,* 966 F.2d 295, 297 (7th Cir.1992) (holding that district court properly treated 12(b)(1) motion that indirectly attacked merits of plaintiff's claim as 12(b)(6) motion). Moreover, standing is a jurisdictional issue, and whenever lack thereof is discovered, it is cause for dismissal. *See Minority Employees of Tenn. v. Tennessee,* 573 F.Supp. 1346, 1348 (M.D.Tenn.1983).

facts. *Id.* The case at bar involves a facial attack rather than a factual attack, so the applicable standard is the same one applied in a Rule 12(b)(6) context.

 Under Rule 12(b)(6), a complaint may be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Michigan Bell Telephone Co. v. MFS Intelenet of Mich., Inc.,* 16 F.Supp.2d 817, 822–23 (W.D.Mich.1998). The complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. The Court, however, need not accept as true legal conclusions or unwarranted factual inferences. *Id.* (citing *Lewis v. ACB Business Serv., Inc.,* 135 F.3d 389, 405 (6th Cir.1998)). The purpose of a 12(b)(6) motion is to determine whether the plaintiff has stated a claim upon which relief may be granted. If the plaintiff lacks standing to bring the claim in the first place, then it has not stated a claim for which relief may be granted.

### B. Article III Requirements

 Federal jurisdiction is limited by the restrictions embodied in Article III of the United States Constitution. *Plastic Engineered Components, Inc. v. Titan Indemnity Co.,* 974 F.Supp. 1106, 1109 (W.D.Mich.1997) (citing *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986)). Consequently, whenever it appears that the Court lacks jurisdiction over the subject-matter, the Court is required to dismiss the action. Moreover, subject-matter is presumed lacking until the pleader proves otherwise. *Plastic Engineered Components, Inc.,* 974 F.Supp. at 1109; *see* Fed. R. Civ. P 8(a)(1).

 Article III § 2 of the Constitution confers jurisdiction in the federal courts over "cases" and "controversies." "One element of the case or controversy requirement is that [the plaintiff], based on [its] complaint, must establish that [it] has standing to sue. The standing inquiry focuses on whether the plaintiff is the proper party to bring this suit." *Raines v. Byrd,* ── U.S. ──, ──, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997). The Supreme Court has described the case

or controversy requirement as "immutable," *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997), and as the "irreducible constitutional minimum." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To satisfy Article III's case or controversy requirement, the plaintiff in every case must demonstrate: (1) that it has "suffered an injury in fact," that is, an "invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent," *id.* at 560, 112 S.Ct. 2130; (2) "a causal connection between the injury and the conduct complained of," *id.;* and (3) that a favorable court decision would likely redress or remedy the injury. *Id.* at 561, 112 S.Ct. 2130. "The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). However, Congress may not grant standing outside the limits imposed by the Constitution.

### C. Prudential Standing

 Besides the Article III case or controversy requirement, courts are generally also bound by "prudential limitations" on the exercise of federal jurisdiction. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Prudential limitations are "judicially self-imposed limits on the exercise of federal jurisdiction that may preclude a litigant's standing." *Family & Children's Center, Inc. v. School City of Mishawaka,* 13 F.3d 1052, 1059 (7th Cir. 1994). These limits include:

> the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interest protected by the law invoked.

*Id.* (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

Whereas Article III requirements are immutable and unwaivable, Congress may override prudential standing limitations by statute. *See Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Warth,* 422 U.S. at 500–01, 95 S.Ct. 2197. The Supreme court has stated:

> In some circumstances, countervailing considerations may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties.... [So long as Article III] is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of legal rights and interests of others....

*Warth,* 422 U.S. at 500–01, 95 S.Ct. 2197. Thus, where Congress intends a statute to grant standing to the full limits of Article III, courts "lack authority to create prudential barriers to standing in suits brought under that [statute]." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

### III. DISCUSSION

#### A. Prudential Standing

 The Seventh Circuit has specifically held that Congress intended to grant standing under the IDEA to the full extent permitted by Article III. *See Family & Children's Center,* 13 F.3d at 1061. In that case, the court examined the wording of 20 U.S.C. § 1415. This Court finds that 42 U.S.C. § 6042 is similarly broad, and that by conditioning funding to each State upon the requirement that the State have in effect a system authorized to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of [disabled] individuals," 42 U.S.C. § 6042(a)(2)(A)(1), Congress implicitly granted standing to advocacy groups to advocate for disabled individuals to the full extent permitted by Article III. TPA therefore "need not run the gauntlet of prudential standing tests; satisfying Article III is enough." *Family & Children's Center,* 13 F.3d at 1061.

In other words, the general prohibition on a litigant's raising another person's legal rights does not apply to TPA. Most courts that have considered the question of a protection and advocacy group's standing have reached the same conclusion without actually mentioning the words "prudential standing." Similarly, the parties in this case appear to be arguing in circles around the question of prudential standing, though neither addresses the question directly. For instance, TPA claims that the legislative history of the most recent amendments to the Developmental Disabilities Act, 42 U.S.C. § 6000 *et. seq.,* conclusively settle the question of whether TPA has standing. In support of its position, TPA quotes the language of the Senate Committee:

> The Committee heard testimony about the waste of scarce resources that are expended on litigating the issue of whether [protection and advocacy] systems have standing to bring suit. *The Committee wishes to make it clear that we have reviewed this issue and have decided that no statutory fix is necessary because the current statute is clear that [protection and advocacy] systems have standing to pursue legal remedies to ensure the protection and advocacy for the rights of individuals with developmental disabilities* within the State.

S.Rep. No. 103–120, at 39 (1993), *reprinted in* 1994 U.S.C.C.A.N. 164, 202 (emphasis added).[2]

 The problem with TPA's argument is that the word "individuals" is ambiguous. TPA reads it to mean "all disabled people in general," while Putnam County and most of the case law on point construe it to mean specific individuals who claim harm. If the former meaning is applied, the statute is

---

**2.** TPA relies on *Tennessee Protection and Advocacy, Inc. v. Metro, Gov't of Nashville,* No. 3–95–0793, Order at 2 (M.D.Tenn. Nov. 11, 1995) (Nixon, J.), for its position. In an order unaccompanied by a memorandum, the Court in that case concluded on the basis of the quoted legislative history that TPA had standing in a case almost identical to this one. This Court respectfully disagrees with that holding.

rendered unconstitutional because it confers standing beyond the bounds of Article III's case or controversy requirement, as discussed above. "Where fairly possible, courts should construe a statute to avoid a danger of unconstitutionality." *Ohio v. Akron Ctr., for Reproductive Health,* 497 U.S. 502, 514, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) (quoting *Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft,* 462 U.S. 476, 493, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983)). If the latter meaning is applied, then the legislative history simply indicates that Congress does not intend for prudential limits, specifically "the general prohibition on a litigant's raising another person's legal rights," to apply.

This latter meaning is consistent with the standing analysis applied in the cases Congress cited approvingly in the same Senate Report, *Goldstein v. Coughlin,* 83 F.R.D. 613 (1979) and *Rubenstein v. Benedictine Hospital,* 790 F.Supp. 396 (N.D.N.Y.1992). *See* S.Rep. No. 103–120, 1994 U.S.C.C.A.N. at 202–03. In *Goldstein,* the plaintiff, Protection and Advocacy System for Developmental Disabilities, Inc., sued *on behalf* of a named individual who was allegedly being harmed by some state action. *See Goldstein,* 83 F.R.D. at 614 ("This action has been initiated on behalf of August Barthaleme."). Defendants contested standing, and the court held that the protection and advocacy group (hereafter "P & A group") had statutorily conferred standing to sue on behalf of a disabled individual, and did not need to claim injury to itself in order to sue. *Id.* at 614.

In *Rubenstein,* the court similarly held that a different P & A group did not need to suffer direct injury in order to sue, but in that case as well the plaintiff was intervening on behalf of named individuals who had allegedly suffered injury. In both cases, the courts implicitly concluded that prudential standing was not required. In neither case did the court address the issue of whether a P & A group could bring an action when it was neither filing on behalf of specific named individuals nor claiming injury-in-fact to itself.

In another case cited by TPA,[3] the court held that a P & A group did have standing to bring a suit for injunctive relief under the Protection and Advocacy for Mentally Ill Individuals Act, 42 U.S.C. § 10805(a)(1)(B) ("PAMII Act") (which is identical to the wording of 42 U.S.C. § 6042(a), under which TPA claims standing). *See Trautz v. Weisman,* 846 F.Supp. 1160 (S.D.N.Y.1994). The *Trautz* court cited *Rubenstein* extensively for its holding. While the P & A plaintiff in *Trautz* was not filing explicitly "on behalf" of a named individual, it was intervening in a case involving specifically injured plaintiffs. The Sixth Circuit has allowed standing in such a context as well. In *Larkin v. Michigan Dept. of Social Services,* the Sixth Circuit affirmed without discussion the lower court's grant of a P & A group's "motion to intervene as of right on the ground that it had a federal mandate to protect the rights of the handicapped." 89 F.3d 285, 288 (6th Cir.1996). In that case too, the P & A group intervened on behalf of specific individuals who had allegedly been harmed by the defendant's action.

There is a significant difference between a case in which a P & A group files suit on its own behalf though not claiming direct injury to itself, and a case in which a P & A group files in conjunction with or on behalf of an

---

**3.** Many of the cases cited by TPA address standing in the context of a direct injury to a P & A group. *See, e.g., Alabama Disabilities Advocacy Program v. J.S. Tarwater Dev. Ctr.,* 894 F.Supp. 424 (M.D.Ala.1995) (plaintiff had standing to sue based on direct injury to itself; court did not reach question of whether organization would have standing to sue on its own behalf if it did not allege injury to itself); *Mississippi Protection & Advocacy Sys. Inc. v. Cotten,* 929 F.2d 1054 (5th Cir.1991) (P & A system filed suit against state seeking injunctive relief when defendant, a state run retardation center, made changes to the visitation policies applicable to the P & A's attorneys); *Robbins v. Budke,* 739 F.Supp. 1479, 1481 (D.N.M.1990) (plaintiff P & A group alleged violations of its own rights under the First Amendment); *Maryland Disability Law Ctr. v. Mt. Wash. Pediatric Hosp., Inc.,* 106 Md.App. 55, 664 A.2d 16 (1994) (concerning plaintiff P & A group's authority to investigate reports of abuse and neglect of disabled children in a private hospital). Other cases cited by TPA involve P & A groups filing on behalf of specifically harmed plaintiffs. *See, e.g., Michigan Protection and Advocacy Serv., Inc. v. Babin,* 799 F.Supp. 695 (E.D.Mich.1992) (filing on behalf of fourteen disabled plaintiffs).

injured party. The District Court of Rhode Island stated in a case involving a P & A group's standing to intervene that, "[c]ontrary to defendants' argument, like any agency charged with enforcement of statutory provisions, the advocacy agency need not show injury to the agency in order to initiate suit or intervene on behalf of an injured party. *The live case or controversy requirement of Art. III is satisfied by injury to Timothy* [the named plaintiff]. Congress can charge an agency with representation and protection of the statutory rights of the particularly helpless developmentally disabled." *Naughton v. Bevilacqua,* 458 F.Supp. 610 (D.R.I.1978), *aff'd,* 605 F.2d 586 (1st Cir. 1979) (emphasis added).

■■■■ Unfortunately, the plaintiff in this case is not filing on behalf of specific, named, injured individuals. It merely alleges that the defendant's conduct discriminates against all the disabled children in the Putnam County school system.[4] Because prudential limitations do not apply to an organization filing a claim under the IDEA, TPA could establish standing if it filed suit on behalf of specific individuals who themselves have allegedly suffered concrete harm as a result of the defendant's actions. However, where there is no specifically injured plaintiff on whose behalf the P & A group files a claim, then the organization must allege direct injury-in-fact to itself in order to satisfy the Article III case or controversy requirement.

In *Protection & Advocacy, Inc. v. Murphy,* 1992 WL 59100 (N.D.Ill. Mar.16, 1992), the district court in that case considered the precise issue presented in the case at bar. In *Murphy,* the plaintiff had initially filed a complaint against state and federal administrators of the Medicaid program. The complaint set forth the plaintiff's interpretation of a federal statute, and asked that its interpretation be declared law. The court found that the complaint did not meet Article III requirements, but, rather than dismissing the action entirely, allowed the plaintiff to amend

its complaint. The plaintiff filed an amended complaint in which it added allegations filed on behalf of two specific individuals. However, the court found that the allegations filed on behalf of one of the individuals were moot, and those filed on behalf of the other individual were not yet ripe because of failure to exhaust administrative remedies. The court, after lengthy discussion, ultimately dismissed the complaint for lack of standing, stating:

Federal courts have uniformly found that protection and advocacy systems have standing to sue in their own name to protect the rights of injured developmentally disabled or mentally ill individuals or to protect its own rights. . . .

In addition, the courts have recognized the need to facilitate the ability of protection and advocacy systems to bring such suits in light of the particular vulnerability of their client populations and in the recognition of P & A's ability to define the contours of the issues involved. . . .

[However,] *Warth* [*v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ] . . . establishes the need for specific and concrete factual allegation of injury in order to satisfy Article III. The complaint here does not meet those requirements.

*Enrique Diaz v. Chicago Police Officer Shallbetter,* 1992 WL 5911 at *10–*12 (1992) (some citations omitted).

### B. TPA's Claim of Standing on Basis of Injury–in–Fact

In its original complaint, TPA did not allege injury to itself. On the basis of that complaint, the Court would have concluded at this point that TPA lacks standing. In its proposed amended complaint, however, TPA does allege injury to itself, so the question remaining is whether those allegations would be sufficient to confer standing.

■■■■ The requirements for standing have been characterized as "undemanding," *see North Shore Gas Co. v. E.P.A.,* 930 F.2d

---

**4.** In its proposed amended complaint, TPA claims that "over fifty" disabled students in Putnam County are affected. (Proposed Am. Compl. ¶ 18.) Putnam County points out that "[a]t the case management conference convened before Magistrate Judge Juliet Griffin on May 11, 1998, counsel for Plaintiff was unable to name *a single* individual alleged to have been harmed by the actions of the School System." (Def.'s Rep. to Pl.'s Resp. to Mot. Dismiss at 4.)

1239, 1242 (7th Cir.1991), but they are nonetheless inflexible. The first requirement is that TPA show injury-in-fact. In its proposed amended complaint, as discussed above, TPA claims that because it has devoted resources to this litigation that could have been spent elsewhere, it has suffered a direct injury-in-fact sufficient to satisfy Article III requirements. In support of its position, TPA relies on *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), *Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir.1993), and *Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer*, 943 F.2d 644, 646 (6th Cir. 1991).[5] In *Havens*, the plaintiff, an organization devoted to promoting equal opportunity in housing, brought suit on its own behalf, claiming standing on the basis of direct injury-in-fact to the organization.[6] In its complaint, the organization alleged that it had been "frustrated" by defendants' allegedly illegal actions "in its efforts to assist equal access to housing through counseling and other referral services." *Id.* at 379, 102 S.Ct. 1114. It allegedly had been required "to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory ... practices." *Id.* The Supreme Court held that if the defendants' illegal activities had "perceptibly impaired" the plaintiff's ability to provide services to low- and middle-income homeseekers, then there was "no question that the organization has suffered injury in fact." *Id.*

The Sixth Circuit cases relied upon by the plaintiff in this case likewise cite *Havens* to support findings that organizational plaintiffs had alleged sufficient injury in fact to satisfy Article III requirements. In *Housing Opportunities Made Equal*, the plaintiff organization asserted that the defendant newspaper's advertisements violated the Fair Housing Act (FHA). The Sixth Circuit found that the plaintiff could "establish

standing by alleging a concrete and demonstrable injury arising from a purportedly illegal action [that] increases the resources the group must devote to programs *independent of its suit challenging the action.*" 943 F.2d at 646 (emphasis added) (citing *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.), *cert. denied*, 498 U.S. 980, 111 S.Ct. 508, 112 L.Ed.2d 521 (1990)). The plaintiff alleged that the defendant's discriminatory practices had caused the plaintiff to devote resources to investigating and negating the impact of the defendant's actions. The Sixth Circuit concluded that the allegation was sufficient to confer standing.

In *Hooker*, another organization that works to eliminate discriminatory housing practices brought suit (in conjunction with directly injured individuals) claiming direct injury-in-fact on the basis that it had devoted resources to conducting an investigation of the defendants' practices. There, the plaintiff had investigated by allegedly sending out a "tester" to see whether the defendant would discriminate against her. *See* 990 F.2d at 914. Citing both *Havens* and *Housing Opportunities*, the court determined that the plaintiff's allegations were sufficient to confer standing at the pleadings stage. *See id.* at 915.

Unlike the plaintiffs in *Havens, Housing Opportunities*, and *Hooker*, TPA does not allege injury to itself *"independent of its suit challenging the action."* *Housing Opportunities*, 943 F.2d at 646. The cases cited above make it clear that where an organization alleges that it has devoted additional resources it otherwise would not have in an effort to counteract discrimination, it has met the Article III standing requirement. However, it is also clear that, as quoted above, TPA's complaint alleges only that challenging the defendant's action has caused it direct injury. *See* Proposed Am. Compl. ¶ 30.

5. TPA also cites *Linton by Arnold v. Comm'r of Health and Env't*, 973 F.2d 1311, 1316–17 (6th Cir.1992), which is completely inapposite to the case at bar. In that case, the Sixth Circuit found that nursing homes had standing to seek appellate review of post-judgment motions where they alleged "contractual, statutory, and economic interests which [had] been and continue[d] to be

directly injured by [the acts at issue]." *Id.* at 1316.

6. The organization also claimed representational standing. Because the Court found the organization alleged sufficient injury-in-fact, it did not reach the question of representational standing. 455 U.S. at 378, 102 S.Ct. 1114.

The issue confronting this Court then is whether litigation expenses alone can satisfy Article III's direct injury requirement. The Third Circuit considered this precise question in *Fair Housing Council of Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78–79 (3d Cir.1998), and concluded that they did not. In reaching its conclusion, the court emphasized its commitment to the goals embraced by the plaintiff in that case, but nonetheless maintained that those goals "should not be attained by an approach which shrinks the Article III standing requirement to a point where the requisite injury flows automatically from the burdens associated with filing a lawsuit." *Id.* at 80. This Court agrees, and holds as a matter of law that litigation expenses alone do not constitute injury sufficient to support standing.[7] "An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation." *Spann*, 899 F.2d at 27. To allow such "bootstrapping" would reduce the Article III standing requirement to a meaningless exercise.

### CONCLUSION

Because TPA is not filing on behalf of specific injured individuals, and because it fails to allege injury to itself other than litigation expenditures, the Court must conclude that TPA has failed to establish standing as required by Article III of the Constitution. Defendant's motion to dismiss is therefore GRANTED. Plaintiff's motion to amend its complaint is DENIED, as the Court has determined that the proposed changes would not cure the constitutional defects. The Court also finds that the filing of TPA's Supplemental Brief was in direct violation of Magistrate Judge Griffin's Order of June 8, 1998 that no other filings in support of or opposition to the motion to dismiss would be permitted without the express permission of the Court. (*See* Doc. 22 at 1.) Defendant's motion to strike is therefore GRANTED.

The Court emphasizes that in reaching this conclusion, it has "no doubt about the sincerity of [TPA's] stated objectives and the depth of [its] commitment to them. But the essence of standing 'is not a question of motivation but of possession of the requisite interest that is, or is threatened to be, injured by the unconstitutional conduct.'" *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 225–26, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), *quoted in Fair Housing Council of Philadelphia*, 141 F.3d at 80.

The Court does not reach the question of whether TPA should be required to exhaust administrative remedies or the question of dismissal for failure to state a claim.

It is so ORDERED.

### ORDER

Before the Court are defendant's motion to dismiss complaint for lack of standing, plaintiff's motion to amend complaint and supplemental brief in opposition to the motion to dismiss, and defendant's responsive motion to strike pleadings.

For the reasons set forth in the accompanying memorandum, the Court GRANTS defendant's motion to dismiss on the basis of lack of standing.

The Court has considered plaintiff's proposed amended complaint and concludes that it does not cure plaintiff's lack of standing. Plaintiff's motion to amend its complaint is therefore DENIED.

Although the Court considers the cases cited in plaintiff's supplemental brief in the accompanying memorandum, it finds that filing of that brief was in direct violation of Magistrate Judge Griffin's Order of June 8, 1998 that no other filings in support of or opposition to the motion to dismiss would be permitted without the express permission of the Court. (*See* Doc. 22 at 1.) Defendant's motion to strike is therefore GRANTED.

It is so ORDERED.

---

7. *But see Village of Bellwood v. Dwivedi*, 895 F.2d 1521 (7th Cir.1990) (to have standing fair housing organization need only show deflection of time and money from counseling to legal efforts).