Michael and Susan RISINGER, on Behalf of Their Minor Daughter, Jill Risinger; Annmarie Fitzpatrick, on Behalf of Her Minor Son, Eric Fitzpatrick, all on behalf of themselves and others similarly situated; and the Disability Rights Center of Maine, Inc., Plaintiffs,

v.

Kevin CONCANNON, Commissioner, Maine Department of Human Services; and Lynn Duby, Commissioner, Maine Department of Mental Health and Mental Retardation and Substance Abuse Services, Defendants

No. CIV. 00–116–B–C.

United States District Court,
D. Maine.

Oct. 12, 2000.

---

William J. Kayatta, Jr., Margaret Minister O'Keefe, Pierce, Atwood, Portland, ME, Peter M. Rice, Patrick Ende, Maine Equal Justice Partners, Augusta, ME, for Michael Risinger, on behalf of his minor daughter Jill Risinger, Susan Risinger, Annmarie Fitzpatrick, on behalf of her minor son, Eric Fitzpatrick, Disability Rights Center of Maine, Inc., plaintiffs.

Christopher Leighton, Human Services Division, Augusta, ME, for Commissioner, Maine Department of Human Services, Commissioner, Maine Department of Mental Health and Mental Retardation and Substance Abuse Services, defendants.

### MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Plaintiffs, parents of children enrolled in the Maine Medicaid program who have been diagnosed with severe emotional illnesses or mental health impairments and Disability Rights Center of Maine, Inc. ("DRC"), a nonprofit corporation organized under the laws of the State of Maine, have filed an action seeking declaratory and injunctive relief against Defendants Kevin Concannon, Commissioner of Maine Department of Human Services, and Lynn Duby, Commissioner of Maine Department of Mental Health, Mental Retardation and Substance Abuse Services, in their official capacities. In their Amended Complaint (Docket No. 2), Plaintiffs ask the Court to order Defendants to revise their policies, practices, and procedures to meet the requirements of the federal Medicaid Act, 42 U.S.C. § 1396 *et seq.*, alleging that Defendants' current administration of the Early and Periodic Screening, Diagnosis, and Treatment ("EPSDT") aspect of the Maine Medicaid program violates the Federal Medicaid Act's EPSDT and reasonable promptness-of-service provision requirements, and that it also deprives them of their civil rights under 42 U.S.C. § 1983. Specifically, Plaintiffs allege that Defendants have failed to provide or arrange for case managers, screening services, and corrective or ameliorative treatment sufficient to satisfy the Federal Medicaid Act's EPSDT requirements. *See* 42 U.S.C. §§ 1396a(a)(30), (a)(43), 1396d(a)(4)(B), (r)(5) and 42 C.F.R. § 441.50 *et seq.*

Plaintiffs also allege that Defendants have failed to provide EPSDT services with reasonable promptness, in violation of 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 441.56(e), and that they have violated 42 C.F.R. § 441.61(b) by adopting policies, practices, and procedures that have diminished the availability of a variety of individual and group providers qualified and willing to provide EPSDT services. Plaintiffs have brought this action on behalf of themselves and the named minor Plaintiffs, as well as all current or future recipients of Medicaid in the State of Maine who are under the age of twenty-one, have a mental health impairment, and are not receiving the services which are the subject of this suit.[1]

## DISCUSSION

Now pending before the Court is Defendants' Motion to Dismiss (Docket No. 3). Defendants have moved to dismiss the case in its entirety under the grounds of ripeness and *res judicata*, and have also moved to dismiss Plaintiff DRC for lack of standing. For the reasons that follow, the Court will deny Defendants' Motion to Dismiss.

## I. RIPENESS

■ Defendants contend that the Maine legislature's 1998 enactment of "An Act to Improve the Delivery of Mental Health Services to Children," P.L. 790, L.D. 2295, *codified as* 15 M.R.S.A. §§ 15001–15004, renders Plaintiffs' claims unripe. Defendants argue that because this Act sets forth a five-year plan for the development of an interdepartmental unified mental health services delivery system and Plaintiffs' suit "asks for the very things which the legislature has mandated the Departments provide," Plaintiffs' filing of this suit comes "three years too soon." Plaintiffs respond that the ripeness doctrine does not bar their claims because they suffer

immediate and ongoing harm as a result of Defendants' present actions and inactions. Additionally, Plaintiffs maintain that a determination that their claims are unripe because of the state's five-year plan would have the improper effect of allowing Defendants to circumvent the federal Medicaid mandate through long-term planning.

■ The "basic rationale" of the ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), *abrogated on other grounds, Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). *See also Pacific Gas and Electric Company v. State Energy Resources Conservation & Development Commission*, 461 U.S. 190, 200–01, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983). Accordingly, the ripeness doctrine applies when a " 'claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all.' " *Lincoln House v. Dupre*, 903 F.2d 845, 847 (1st Cir.1990) (citing 13A Charles Alan Wright and Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 3532.2, at 41 (1984)). The Supreme Court has identified two considerations that a court should evaluate in deciding whether to hear a claim that involves such contingencies: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515.

Given this framework, it is clear that Plaintiffs' claims do not suffer from lack of ripeness. Defendants have not identified any factual contingencies in Plaintiffs' case. *See, e.g., Abbott Laboratories*, 387 U.S. at 149–154, 87 S.Ct. at 1516–19 (considering ripeness of pre-enforcement

---

**1.** Although Plaintiffs have filed this case as a class action, the Court has not yet certified     the class.

challenge to Federal Food and Drug Administration regulation); *Riva v. Commonwealth of Massachusetts*, 61 F.3d 1003, 1009–12 (1st Cir.1995) (considering ripeness of predisbursement challenge to state's accidental disability retirement scheme). Instead, Defendants in effect have argued that the rights that Plaintiffs seek to enforce do not yet exist because the Maine legislature has yet to fully implement federal Medicaid law. This argument is flawed in that it ignores the present mandate of federal Medicaid law and misstates the ripeness doctrine, which addresses factual contingencies rather than the legal merits of a case. Plaintiffs seek relief for concrete and current injuries under existing federal Medicaid law, and their claims are therefore ripe for judicial review.

## II. *RES JUDICATA*

Defendants also move to dismiss this case on the grounds of *res judicata*, maintaining that the issues presented by Plaintiffs either were raised or should have been raised in the case of *French v. Concannon*, Civil No. 97–24–B–C, which was dismissed by this Court in June 1998. Plaintiffs dispute the applicability of *res judicata*, noting that *French* was dismissed without prejudice.

■ The doctrine of *res judicata* precludes the relitigation of claims that were raised or could have been raised in a prior case if the Court determines that the party opposing the present litigation has established three elements: the resolution of the earlier action in a final judgment on the merits; "sufficient identity between the causes of action asserted in the earlier and later suits"; and "sufficient identity between the parties in the two suits." *See Porn v. National Grange Mutual Insurance Company*, 93 F.3d 31, 34 (1st Cir. 1996). In this case, the first element of *res judicata* has not been established.

*French* did not result in a final judgment on the merits, but, instead, was voluntarily dismissed without prejudice by party agreement and court order pursuant to Fed.R.Civ.P. 41(a)(2).[2] *See* Order of Dismissal, *French*, Civ. No. 97–24–B–C (Docket No. 76). "[I]t is well settled that '[t]he effect of a voluntary dismissal without prejudice is to render the proceedings a nullity and leave the parties as if the action had never been brought'" for the purposes of *res judicata*. *McCarthy v. National Railroad Passenger Corp.*, 915 F.2d 43, 48 (1st Cir.1990) (citing *In re Piper Aircraft Distribution System Antitrust Litigation*, 551 F.2d 213, 219 (8th Cir.1977)). Hence, the doctrine of *res judicata* does not bar litigation of the issues raised in this case.

## III. STANDING

Defendants move to dismiss Plaintiff DRC from this case, contending that DRC lacks standing to file the claims presented in the Amended Complaint. DRC has asserted standing to file these claims on its own behalf, as well as on behalf of the minors whose rights have allegedly been violated.

### A. The Standing Doctrine

■ The standing doctrine has its roots in both Article III of the United States Constitution and prudential considerations. *See Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ("This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."). *See also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (explaining that "[t]he term 'standing' subsumes a blend of constitutional requirements and prudential considerations"). Article III restricts the

---

**2.** Rule 41(a)(2) sets forth the procedures for court-ordered voluntary dismissal and states that "[u]nless otherwise specified in the or-

der, a dismissal under this paragraph is without prejudice." Fed.R.Civ.P. 41(a)(2).

jurisdiction in the federal courts to the adjudication of "actual 'cases' and 'controversies,'" *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), and standing to sue constitutes "[o]ne element of the case or controversy requirement." *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997). "The standing inquiry focuses on whether the plaintiff is the proper party to bring [a] suit." *Id.*

▆▆▆ Article III sets "the irreducible constitutional minimum" that a plaintiff must satisfy in order to establish standing, and the Supreme Court has identified three elements that a plaintiff must demonstrate in order to meet this constitutional floor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2135, 119 L.Ed.2d 351 (1992). First, a plaintiff must demonstrate "an injury in fact," defined as "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent." *Id.* In addition, a plaintiff must also demonstrate "a causal connection between the injury and the conduct complained of," and that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561, 112 S.Ct. at 2136. A plaintiff's factual burden for establishing these elements depends on the stage of the litigation. *See id.* "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, because on a motion to dismiss [a court] 'presum[es] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (citing *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990)). *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). If a plaintiff does not carry its burden of establishing these minimum standing requirements, the Court must dismiss the plaintiff's case for lack of jurisdiction.

▆▆▆ In addition to constitutional limits on standing, "several judicially self-imposed limits" confine the federal courts' exercise of jurisdiction. *Allen*, 468 U.S. at 751, 104 S.Ct. at 3324 (citing *Valley Forge*, 454 U.S. at 474–75, 102 S.Ct. at 759–60). "[T]he general prohibition on a litigant's raising another person's legal rights" is among these "prudential" limits on standing. *Allen*, 468 U.S. at 751, 104 S.Ct. at 3324. Closely related "to the policies reflected in the Article III requirement of actual or threatened injury amenable to judicial remedy," *Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760, prudential limitations on standing are "'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997) (citing *Warth*, 422 U.S. at 498, 95 S.Ct. at 2205). Significantly, "unlike their constitutional counterparts," prudential limitations "can be modified or abrogated by Congress." *See Bennett*, 520 U.S. at 162, 117 S.Ct. at 1161. Hence, "Congress may grant an express right of action to a person who otherwise would be barred by prudential standing rules." *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206.

▆▆▆ Within this framework, the standing doctrine recognizes that it may be permissible for an organization to sue on behalf of itself, as well as to have the ability to sue on behalf of others in certain circumstances.

## B. Plaintiff DRC's Standing to Sue on Its Own Behalf

▆▆▆ An organization has standing to sue on its own behalf if the organization itself can satisfy the irreducible constitutional minimum requirements and prudential concerns do not point to the need for judicial restraint. *See Warth*, 422 U.S. at 511, 95 S.Ct. at 2211 ("There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy."). *See, e.g., Havens Realty*

*Corp. v. Coleman,* 455 U.S. 363, 378–79, 102 S.Ct. 1114, 1124–25, 71 L.Ed.2d 214 (1982) (applying "same inquiry as in the case of an individual" to determine that nonprofit equal housing opportunity corporation had suffered injury in fact in form of "impaired ... ability to provide counseling and referral services for low—and moderate-income homeseekers").

▉▉▉ Plaintiff DRC alleges that Defendants have "failed to provide services to DRC's legally protected interest," and it also alleges that "[t]his injury is concrete, particularized, actual and imminent," caused by Defendants' alleged conduct, and likely to be redressed by a favorable decision. Amended Complaint ¶ 69. These legal conclusions are insufficient to meet Plaintiff's burden of pleading standing. Although the Court assumes the truth of factual allegations and draws all reasonable inferences in favor of Plaintiff in resolving a motion to dismiss, *see Roma Construction Co. v. aRusso,* 96 F.3d 566, 568 (1st Cir.1996); *Resolution Trust Corp. v. Driscoll,* 985 F.2d 44, 48 (1st Cir.1993), "this tolerance does not extend to legal conclusions or to 'bald assertions.'" *Id.* (citing *Chongris v. Board of Appeals of the Town of Andover,* 811 F.2d 36, 37 (1st Cir.1987), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987)).

In this case, legal conclusions are all that Plaintiff DRC has pleaded in regards to its own injury. Plaintiff DRC's allegations of standing essentially consist of the language the Supreme Court used to articulate the standing test in *Defenders of Wildlife. See* Amended Complaint ¶ 69; *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. at 2135. Although Plaintiff DRC has argued that these allegations make clear that it has suffered injury that "goes to the core of its function—and indeed, the reason for its existence," the Court thinks otherwise. Moreover, the First Circuit has promulgated a heightened pleading requirement for the purposes of standing, requiring a plaintiff to "set forth reason-

ably definite factual allegations, either direct or inferential, regarding each material element needed to sustain standing." *U.S. v. AVX Corp.,* 962 F.2d 108, 115 (1st Cir. 1992). Plaintiff DRC has not pleaded any facts pertaining to the requisite injury, causation, or likelihood of redress needed to sustain standing to sue on its own behalf.

## C. DRC's Standing to Sue on Behalf of the Minor Plaintiffs

▉▉▉ An organization's standing to sue on behalf of others, referred to as "associational standing," can derive from either judicial discretion or a congressional grant. *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 551, 116 S.Ct. 1529, 1533, 134 L.Ed.2d 758 (1996). *See, e.g., id.* at 558, 517 U.S. 544, 116 S.Ct. 1529, 1537, 134 L.Ed.2d 758 (1996) (upholding Congressional grant of standing); *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343–44, 97 S.Ct. 2434, 2441–42, 53 L.Ed.2d 383 (1977) (conferring standing to state apple advertising commission to bring suit on behalf of state's apple growers in the absence of a statute providing for standing). In *Hunt,* the Supreme Court articulated a three-part test for courts to apply in deciding whether to allow an organization to bring suit on behalf of its members. *See Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441. First, the organization/ association must demonstrate that "its members would otherwise have standing to sue in their own right." *Id.* Second, the interests that the organization "seeks to protect" must be "germane to the organization's purpose." *Id.* Third, "neither the claim asserted nor the relief requested [may] require[ ] the participation of individual members in the lawsuit." *Id.* In *United Food and Commercial Workers Union,* the Court explained that the Article III limitations on standing required the satisfaction of only the first

two prongs of this test.[3] *See United Food and Commercial Workers Union,* 517 U.S. at 554–55, 116 S.Ct. at 1535–36 (1996). Therefore, Congress may grant standing to an organization to sue on behalf of its members as long as its members would have standing to sue in their own behalf and the litigation is germane to its purposes.

In support of its claim of standing to sue on behalf of children who have mental health impairments, DRC has invoked provisions of three statutes: the federal Developmental Disabilities Assistance and Bill of Rights Act ("DDA"), 42 U.S.C. § 6042(a)(2)(A), the federal Protection and Advocacy for Mentally Ill Individuals Act ("PAMI"), 42 U.S.C. §§ 10805(a)(1)(B), (C), and the State of Maine's Protection and Advocacy for Persons with Developmental or Learning Disabilities or Mental Illnesses Act, 5 M.R.S.A. § 19505(3). The DDA requires states, as a condition of receiving federal financial assistance, to "have in effect a system to protect and advocate the rights of individuals with developmental disabilities." 42 U.S.C. § 6042(a)(1). The statute goes on to mandate that the "system must have the authority to pursue legal, administrative and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the State who are or who may be eligible for treatment, services, or habilitation, or who are being considered for a change in living arrangements, with particular attention to members of ethnic and racial minority groups." 42 U.S.C. § 6042(a)(2)(A)(i). The PAMI sets forth similar requirements for the protection of individuals who have mental illnesses, *see* 42 U.S.C. § 10805(a)(1)(B), and also directs states to grant the system

> authority ... to pursue administrative, legal, and other remedies on behalf of an individual who was a[n] individual with mental illness; and is a resident of the State; but only with respect to matters which occur within 90 days after the date of the discharge of such individual from a facility providing care or treatment.

42 U.S.C. § 10805(a)(1)(B). The State of Maine's advocacy program, passed pursuant to these two federal statutes, *see* 5 M.R.S.A. § 19501 *et seq.,* provides for the designation of such an agency, *see* 5 M.R.S.A. § 19502, and states that this "agency may pursue administrative, legal and other appropriate remedies on behalf of persons with disabilities." 5 M.R.S.A. § 19505(3). The parties do not dispute that Plaintiff DRC is the agency designated pursuant to this statutory scheme.

These statutes grant standing to Plaintiff DRC to file claims on behalf of the minor Plaintiffs in this case. Federal courts interpreting the DDA and PAMI have uniformly concluded that the relevant provisions confer standing to sue on behalf of individuals with mental illness and developmental disabilities. *See Doe v. Stincer,* 175 F.3d 879, 885–86 (11th Cir.1999) (holding that 42 U.S.C. § 10805 confers standing to bring suit on behalf of individuals with mental illness); *Brown v. Stone,* 66 F.Supp.2d 412, 422–23 (E.D.N.Y.1999) ("standing appears warranted" under 42 U.S.C. § 10805); *Tennessee Protection and Advocacy, Inc. v. Board of Education of Putnam County, Tennessee,* 24 F.Supp.2d 808, 814 (M.D.Tenn.1998) (finding implicit Congressional grant of standing "to advocacy groups to advocate for

---

**3.** Specifically, the Court noted that the *Warth* decision expressly establishes the constitutionally required status of the first prong of the test. *See id.* at 554–55, 116 S.Ct. at 1535 (citing *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211). The Court also held that the third prong of the test does not constitute a constitutional requirement of standing, but explicit-

ly refrained from determining the constitutional status of the second prong. *See* 517 U.S. at 557, 116 S.Ct. at 1536, n. 6 ("We ... need not decide whether this prong is prudential in the sense that Congress may definitively declare that a particular relation is sufficient.").

disabled individuals to the full extent permitted by Article III" in 42 U.S.C. § 6041); *Rubenstein v. Benedictine Hospital,* 790 F.Supp. 396, (N.D.N.Y.1992) (finding standing under 42 U.S.C. § 10801, given its "broad remedial purposes" and "the statutory language apparently conferring a right upon entities such as DAI to pursue legal remedies"); *Michigan Protection and Advocacy Service, Inc. v. Babin,* 799 F.Supp. 695, 702 n. 12 (E.D.Mich.1992) (finding in reference to both statutes that "[i]t was clearly the intention of Congress that the M.P.A.s and other similar advocacy groups represent and, if necessary, litigate on behalf of individuals suffering from developmental disabilities"), *affirmed on other grounds,* 18 F.3d 337 (6th Cir.1994); *Protection and Advocacy, Inc. v. Murphy,* 1992 WL 59100, \*10 (N.D.Ill.1992) ( "Federal courts have uniformly found that protection and advocacy systems have standing to sue in their own name to protect the rights of injured developmentally disabled or mentally ill individuals."); *Goldstein v. Coughlin,* 83 F.R.D. 613, 614 (W.D.N.Y. 1979) (reasoning that "given the Congressional purpose to provide retarded persons with legal representation, as revealed in § 6012," state's designated advocacy group "need show no injury to itself in order to have standing in this action").[4]  Given the broad remedial purposes of the DDA and PAMI, Plaintiff DRC's status as the designated advocacy group, and the specific language in 5 M.R.S.A. § 19505(3) regarding the ability to pursue legal remedies "on behalf of persons with disabilities," this Court likewise concludes that Plaintiff DRC has been granted standing to sue on behalf of the children in this case.

■ This determination leaves the Court to decide whether Article III considerations preclude Plaintiff DRC's ability to have standing to bring suit on behalf of the minor Plaintiffs in this case.  The Supreme Court's holdings on associational and individual standing guide this analysis. As discussed *supra,* an organization has satisfied the constitutional requirements for standing if it establishes both that an individual member would otherwise have standing to bring the claim in his or her own right and that the purposes of the organization are germane to the claim brought by the organization.  *See United Food,* 517 U.S. at 555–56, 116 S.Ct. at 1535–36.  Plaintiff DRC has adequately established both of these elements.  With regard to individual members' standing to bring suit on their own behalf, the Amended Complaint adequately alleges each of the elements of individual standing required by *Defenders of Wildlife.  See* 504 U.S. at 560, 112 S.Ct. at 2135.  Plaintiff DRC has satisfied the injury-in-fact requirement by identifying two youths in Maine and alleging their injuries in the forms of not receiving the screening, case management, and services that Defendants have an obligation to provide under federal Medicaid law, as well as the youths' stagnant or worsened mental health conditions. *See* Amended Complaint ¶¶ 52, 58–59. Plaintiffs have identified Defendants' current policies, practices, and procedures as the cause of these injuries, and the injunctive and declaratory relief sought by Plaintiffs would likely redress the injuries of which Plaintiffs complain.  With regard to the second constitutional requirement for organizational standing, germaneness, Plaintiff DRC has relied on federal and state statutes to identify itself as the "statewide protection and advocacy agency to protect and advocate for the legal and civil rights of those citizens who have physical, mental and learning disabilities" pursuant to these acts, and it has articulated its purpose as "protect[ing] and advocat[ing] for the rights of those persons within the State of Maine who are, or who may be, eligible for treatment, services, or habilitation due to their physical, mental, and/or learning disabilities." *See* Amend-

---

4.  The Court notes that the two federal statutes only require the States to confer standing on an organization and do not independently do so.  Nevertheless, the language of 5 M.R.S.A. § 19505 clearly constitutes a positive grant of standing by the Maine legislature.

ed Complaint ¶¶ 10, 11. These purposes are distinctly germane to the subject of this suit, which seeks to enforce those rights.

■ Although Plaintiff DRC is not a traditional membership organization, this alone "does not deprive it of Article III standing." *Doe*, 175 F.3d at 885. While the First Circuit has not determined whether the analysis for associational standing applies to nonmembership organizations, two circuit courts of appeals have addressed this issue. In *Doe*, the Eleventh Circuit held that the nonmembership status of the Advocacy Center for Persons with Disabilities, a state agency established under 42 U.S.C. § 10801, did not preclude its ability to fulfill the requirements for associational standing. *See* 175 F.3d at 885. In support of this conclusion, the court cited to the Supreme Court's specific rejection of a similar argument in *Hunt*, reasoning that, similarly to the state Apple Advertising Commission, although the Advocacy Center did not have individual members, it had congressional designation "to 'serve a specialized segment of the community which is the primary beneficiary of activities,'" it had performed "'the functions of a traditional ... association,'" and it had represented individuals who possessed "'the indicia of membership in an organization.'" *See id.* at 885–86 (citing *Hunt*, 432 U.S. at 344–45, 97 S.Ct. at 2442–43). The court concluded that indicia of membership was demonstrated by the statutory scheme requiring the inclusion of individuals receiving mental health services on federally mandated multi-member governing boards and advisory counsels, as well as by the statute's requirement of a grievance procedure for clients and prospective clients of the agency. *See Doe*, 175 F.3d at 886 (citing 42 U.S.C. §§ 10805(a)(6)(B), (8), (9), (c)(1)(B)). By contrast, the Fifth Circuit rejected an advocacy organization's claim of associational standing in *Association for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Center*

*Board of Trustees*, 19 F.3d 241, 244 (5th Cir.1994). In a cursory analysis that did not account for the nonmembership status of the organization in *Hunt*, the court reasoned that the organization could not establish the first prong of the inquiry for associational standing because the disabled individual was "not a 'member'" and the organization bore "no relationship to traditional membership groups because most of its 'clients'—handicapped and disabled people—are unable to participate in and guide the organization's efforts." *Id.* Given the Supreme Court's reasoning in *Hunt* and the indicia of membership evidenced by the statutory scheme providing for the participation of the beneficiaries of DRC's activities, *see* 42 U.S.C. §§ 6042(a)(2)(D), (E), (e)(1), (4)(B); 42 U.S.C. §§ 10805(a)(6)(B), (9), (c)(1)(B); 5 M.R.S.A. § 19504(2)(B), the Court chooses to follow the Eleventh Circuit's reasoning and concludes that DRC's status as a nonmembership organization does not preclude its standing to sue on behalf of the individuals it is charged with protecting.

### CONCLUSION

Because Plaintiffs' claims are ripe for review, the doctrine of *res judicata* does not bar the present litigation, and Plaintiff DRC has standing to sue on behalf of the minor Plaintiffs in this case, Defendants' Motion to Dismiss will be denied.

Accordingly, the Court **ORDERS** that the Defendants' Motion to Dismiss be, and it is hereby, **DENIED**.